McBride v. Whitaker.

THOMAS McBRIDE, APPELLANT, V. GEORGE WHITAKER ET UX., APPELLEES, IMPLEADED WITH WILLIAM H. KIL-GORE ET UX., APPELLANTS.

FILED JUNE 4, 1902.   No. 11,090.

Commissioner's opinion, Department No. 3.

1. **Riparian Rights:** GRANT: AD FILUM AQUÆ. Grants of land bounded upon a river not navigable carry with them the ex-clusive right and title of the grantee to the centre of the stream, unless the terms of the grant clearly denote the inten-tion to stop at the bank or margin of the river; the rule of the common law being that proprietors of land adjoining public rivers not affected by the flow of the tide own the soil *ad filum aquæ.*

2. **Grant by General Government:** ISLAND. A grant of land bounded upon a non-navigable, river, made by the general government with reference to the plat of the survey, which shows a mean-dered line along the river bank, conveys to the grantee title to such unsurveyed islands or parts of islands as lie within that limit.

3. **Public Lands:** CORRECTION OF SURVEY: POLITICAL DEPARTMENT OF GENERAL GOVERNMENT: COLLATERAL ATTACK. The power to make and correct surveys of the public lands belongs exclusively to the political department of the general government, and a plat of a survey made and approved by that department can not be im-peached in the courts, except upon a direct proceeding for that purpose.

4. **Action Quia Timet:** EQUITY SIDE OF DOCKET: DEFENDANT'S AN-SWER: ESTOPPEL. A party defendant in an action to quiet title, can not be heard to complain that the action was brought on the equity side of the docket, when by his answer he has in-voked the action of the court in his own behalf.

APPEAL from the district court for Buffalo county. Heard below before SULLIVAN, J. *Reversed.*

*Willis D. Oldham, J. M. Easterling, H. M. Sinclair, E. C. Calkins* and *H. V. Calkins,* for appellants.

*Frank E. Beeman* and *Fred A. Nye* (*Hamer & Hamer,* on motion for rehearing), *contra.*

DUFFIE, C.

The northeast quarter of section 12, township 8 north of range 15 west, in Buffalo county, Nebraska, is intersected by a channel of the Platte river, known as "Mosquito channel." That part of the section lying north of this channel was surveyed into one full forty-acre tract, and two fractional lots, numbered on the government plat as 6 and 7. That part of the quarter section south of the channel consists of a fractional lot marked on the government plat as lot 8. About midway between these lots in the centre of the channel is an island which was never surveyed, and McBride, the owner of lot 8, and Kilgore, who claims to be the owner of lots 6 and 7, each claim title to a portion of this island, asserting that their grant of the fractional lots above mentioned gave them title to the thread of the channel, including all islands or parts of islands embraced within this limit. McBride and Kilgore could not agree upon a division of the island, and the possession thereto shifted between them, but for many years previous to 1897, one or the other of these parties has been in the actual possession of the island. In April, 1897, the defendant Whitaker took possession of the island, and has had actual possession from that time. This action was brought by the appellant McBride to quiet his title to so much of the island as might fall within the terms of his grant; his petition alleging that the meandered lines, as shown by the field notes, do not coincide with the banks of the said Mosquito channel as they now exist, and that there is a controversy between the plaintiff and the defendant Kilgore as to where said boundary line should be located. He asks that the boundary line be ascertained and established by the court, and his title established as

against the claim of Kilgore.  Whitaker was made a party defendant in this action; it being alleged in the petition that Whitaker had moved upon the island and erected a house thereon, and made claim to the ownership thereof. The court made certain findings of fact and conclusions of law, upon which judgment was entered, from which judgment and decree the plaintiff McBride and the defendant Kilgore have appealed to this court.

The court's findings are as follows:

"That the plaintiff, McBride, at the time of the bringing of this suit, was the owner of lot eight (8) in section twelve (12), township eight (8), range fifteen (15), in Buffalo county, Nebraska; that he made the original entry therefor and obtained title to the same by the United States patent, and has been in the open and notorious possession of the same for fifteen or twenty years. The court further finds that the defendant W. H. Kilgore at the beginning of this suit and for a long time prior thereto, was the owner of lots 6 and 7 in said section; that he became the owner of the same by virtue of a deed to him from the original patentee of said tract, and that he had been in possession of the same for more than ten years prior to the bringing of this suit; that said tract of land, with other land, was within the extreme channels of the Platte river, and that lying between lots 6 and 7 on the north, and lot 8 on the south, was a tract of land in said section 12 of about 22 acres entirely surrounded by certain channels in the Platte river, and which is the tract of land in dispute herein; that the government surveyor when originally surveying said lots 6 and 7 did not actually survey the meander line forming the south line of lots 6 and 7 as they were required to do, but that instead of making an actual survey of said meander line along the said channel bordering on said lots 6 and 7, they falsely show upon the map made by them that they had done so, and located upon said plat what they supposed to be the true meander line of said lots 6 and 7; that they never made an actual survey of the north meander line of said lot 8, but indi-

cated upon the plat made by them what they supposed was the meander line of said lot 8; that they never actually surveyed the meander lines of said tract of land lying between lots 6 and 7 on the one side and lot 8 on the other and which tract is spoken of in the evidence as an island, but that they indicated upon the plat the general outlines of said island as they understood it to be. The court further finds that said channels bordering said tract in dispute, the one being on the south of lots 6 and 7, and the other on the north of lot 8, are substantially the same now as they were at the time the original survey was made, and that said channels are substantially as shown by the plaintiff's plat marked 'Plaintiff's Exhibit A' offered in evidence. The court further finds that the defendant Kilgore at all times since he became the owner of said lots 6 and 7, claimed to be the owner of the tract in dispute as part of his said lots 6 and 7; that such claim had not extended over the period of ten years at the bringing of this suit; that he had possession during a part of the time of all of said tract, and all the time a part of said tract; that McBride, ever since he obtained his final receipt to lot 8, has claimed to be the owner of a part of said island; that they together have had the title to lots 6 and 7 on the one side and lot 8 on the other, and have had possession of the island for more than ten years prior to the bringing of this suit, but that they were contending between themselves during said period as to what part of said island each should have, and did not agree. The court further finds that the south line of said lots 6 and 7 is the channel line as shown in Exhibit A and that the north line of said lot 8 is the channel bounding it on the north as shown in said Exhibit A. As a matter of law, the court concludes that said island should have been surveyed by the government surveyor; that it was a neglect of duty on their part not to survey the same; that the title to said island still remains in the United States; that it was never the intention of the government at the time it gave the patent to said lots 6 and 7 to convey any part of the island, nor was

it the intention of the government to convey it to the patentee of lot 8; that the only interest the defendant Whitaker has in said land is that he claims the right to enter the same as a homestead, and that his right is only what possession would give him, and that he has no title thereto. The court further concludes as a matter of law, that the government is not bound by the failure of the surveyor hired to do this work by his neglect to perform his duty, and that his failure to actually survey said island did not thereby give the parties to whom the government granted the land on either side thereof any right to it."

We doubt very much whether the petition presents a case of equitable jurisdiction. The fact that the plaintiff McBride and the defendant Kilgore each claim ownership of a part of the island in dispute, but can not agree upon the division to be made thereof, does not, in our opinion, present any matter for the equitable interference of the court. Conceding, as we think we must, that as between themselves their claim to ownership of the island is a valid and legal claim, and passes to them with the grant of land along the shore of the channel, the fact that the dividing line between them is in dispute, is not a matter concerning which the equitable jurisdiction of the court may be invoked. Each concedes to the other the ownership and legal title to a portion of the island. The only matter in dispute between them is the establishment of a dividing line, and this is certainly a matter which a court of law has full power and authority to adjust. Both parties have, however, treated the action as one to quiet title, and it was held in *Mollie v. Peters,* 28 Nebr., 670, that "When both parties to a suit by their pleadings claim title to the same tract of land, and each asks to have his title quieted, it is too late after decree for the losing party to urge for the first time that the proper remedy was by an action of ejectment." See, also, *Baumann v. Franse,* 37 Nebr., 807, 811, and cases there cited.

The evidence is undisputed that the government, in the original survey of the land lying along the channel in

which the island in dispute is located, meandered said channel, and ascertained by such survey the number of acres in the respective lots afterward granted to McBride and the grantor of Kilgore. We believe that the rule is without exception that a grant of land bounded upon a river which is not navigable carries with it title to the soil to the centre of the stream. Justice MAXWELL, in *Wiggenhorn v. Kountz*, 23 Nebr., 690, 695, states the rule in the following language: "There is no doubt of the rule that grants of land bounded upon a river not navigable carry with them the exclusive right and title of the grantee to the centre of the stream; unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river, the rule of the common law being that proprietors of land adjoining public rivers not affected by the flow of the tide own the soil *ad filum aquæ*."

The evidence in this case discloses that when the Fort Kearney military reservation was surveyed by the government, instructions were issued to those in charge of the work, to survey only such islands in the Platte river as contained twenty-one acres or upwards. For many years previous to that survey, the question of the title to islands in non-navigable rivers under a grant by the United States had been settled by the supreme court of the United States, and a long line of decisions had been handed down by that court affirming the right of the purchaser of lands bounded by a non-navigable stream to claim title to the islands falling within the grant. The conclusion, therefore, is irresistible that it was the intention of the government to give title to all unsurveyed islands in the Platte river to the grantee of the land bounded by the bank of that river, and the fact that the island in dispute in this case was not surveyed, is conclusive evidence, as against every one except the government itself, that it passed by a grant of land bounded by the river. As between McBride and Kilgore, each affirming that a portion of this island passed to them by virtue of the grant of the shore lands, we think the court erred in holding that they were not

entitled thereto. The United States is not a party to this case, asserting title to this land. It is not insisted that a mistake was made by its surveyor, and that the island in fact contained a sufficient quantity of land to require it to be surveyed; and no third party is here claiming any title to this island derived from the government. In this condition of the case, we think the court should have determined from the evidence what part of the island each of these parties was entitled to claim; acting upon the theory that the island was one which was not to be surveyed under the instructions from the land department, and that it passed by a grant made by the government of the shore lands lying opposite. Whether either of these parties had by his evidence established a clear legal title to any part of this island, is not, in our opinion, the material question in the case. As between themselves, each conceded to the other title to a part of the island in dispute, and the question to be settled was the division line. This question the court should have determined, and not have left the parties to establish their rights by physical force, inviting breaches of the peace and violation of the law by turning them out of court, and disregarding rights which each conceded to the other. Of course, such a decree would not be binding upon the government, which is not a party to the action, and no rights of the government could suffer by the entry of such a decree. Should the government at any time hereafter desire to open this question, and to claim this island for itself or for any grantee, no judgment which this court could enter in this case could in any manner prejudice its rights, as its title to this island could not be affected by proceedings in a case to which it is not a party. Under the belief that this is the correct rule to be applied to these two parties, who are each insisting that the island passed to them under the grant of the shore land, we have examined the evidence relating to the location of the island, and, so nearly as we can ascertain therefrom, we think that it establishes that the island was originally located in the centre of the

stream, midway between the land now held by Kilgore and McBride, and that each of these parties is entitled to one-half of that island.

Coming now to the claim of Whitaker, another and an important question is presented. To every one holding land, the title to which is traced from the United States, the questions what is taken by the grant, and who may question its extent, are of great interest and importance. And first we will dispose of an objection made by Whitaker to the jurisdiction of the court. It is said that if a court of equity can try the question raised, that there is no purpose of having an action of ejectment or forcible entry and detention, and that a litigant may always avoid a jury trial in an action concerning real estate by labelling it *quia timet*. If McBride and Kilgore are the owners of the fee of this island, they could undoubtedly maintain ejectment against Whitaker for the possession, and a resort to equity would be unnecessary, and many cases are found holding that a naked trespasser can gain no right as against one in peaceable possession, and that former peaceable possession is sufficient evidence of title to maintain ejectment. *Jackson v. Hazen*, 2 Johns. [N. Y.], *438; *Whitney v. Wright*, 15 Wend. [N. Y.], 171; *Hubbard v. Little*, 9 Cush. [Mass.], 475; *Swift v. Agnes*, 33 Wis., 228, 240.

In the present case, while Whitaker, in his answer, objected to the jurisdiction of the court of equity to entertain the action against him, he did not stop with that, but alleged that he had taken possession of the island for the purpose of claiming a homestead thereon under the homestead laws of the United States; and in his prayer he asked the following relief: "That the court decree said lands to be government lands subject to entry, and that plaintiff be decreed to have no right, title or interest in said lands, and that defendant George Whitaker be in lawful possession thereof." It is the opinion of the writer that Whitaker can not, after calling on the court for action in his own interest, and for affirmative relief against his

adversaries, be now heard to say that the court whose action he had himself invoked, had no jurisdiction to act in the matter, and that he is estopped to question the right of the court to proceed in the determination of matters which he himself presented for adjudication. This being so, we will now proceed to determine what rights, if any, Whitaker may have in the premises.

The island in dispute and the shore lands now owned by McBride and Kilgore were formerly embraced in the Fort Kearney military reservation. This was surveyed under the act of congress of July 21, 1876. As heretofore stated, the surveyors were instructed by the land department of the general government, having that matter in charge, to survey no islands found in the Platte river not containing 21 acres or more. The island in dispute was not surveyed, and McBride and Kilgore claim that it passed to them, as purchasers of the shore land opposite, while Whitaker insists that the island contains and did contain at the time of the survey, more than 21 acres; that it was not surveyed because of mistake or fraud on the part of the government surveyor; that it is still government land; and that he has a right to enter on the same and to claim it, and hold possession under the homestead laws of the United States. The government plat of the survey shows that the north line of McBride's land and the south line of the land of Kilgore, opposite this island, are bounded by the river bank, as indicated by a meandered line following along the bank of the stream as shown upon the plat. One of the chainmen who assisted in making the government survey is positive in his testimony that no meandered lines along the river bank were actually run by the surveyor, leaving us to understand that the meandered lines shown by the plat were traced thereon by the surveyor, not from any survey made, but according to his idea of the windings of the river, gained from observation alone. That this was the fact is further established by an actual survey made from the field notes of the original survey, which discloses that the meandered lines of

the lands of McBride and Kilgore are in some places opposite this island some distance back from the river bank, leaving quite a body of land between the meandered lines and the shore.

It is insisted that the rule in this state is firmly established that it may be shown by evidence outside and independent of the government plat of the survey that there was unsurveyed land left between the meandered line of a grantee from the government and the river bank to which he claims, and that, if this fact is established, he has no claim to the lands lying between the meandered line and the bank, even though the government plat of the survey shows the meandered line to extend along the bank, and the grant was made with reference thereto. The following cases are referred to as supporting this doctrine: *Lammers v. Nissen,* 4 Nebr., 245; *Bissell v. Fletcher,* 19 Nebr., 725; *Bissell v. Fletcher,* 27 Nebr., 582; *Harrison v. Stipes,* 34 Nebr., 431. We have examined these cases with great interest, and we are unable to see any analogy between the two first cited and the case at bar; nor do we think that it was the intention of this court in the decision of these two cases to establish the rule that one claiming no title or right derived from the United States—a naked trespasser—could question or contradict the correctness of an approved plat of a government survey of public lands. Before examining these cases and the facts involved, it will be well to examine the rule established by the supreme court of the United States relating to the force of an approved plat of a government survey as evidence.

In *West v. Cochran,* 58 U. S., 402, 413, the court said: "It has often been held by this court that the judicial tribunals, in the ordinary administration of justice, had no jurisdiction or power to deal with these incipient claims, either as to fixing boundaries by survey, or for any other purpose; but that claimants were compelled to rely upon congress, on which power was conferred by the constitution to dispose of, and make all needful rules and

regulations respecting the territory of the United States. Among these needful regulations was that of providing that these unlocated claims should be surveyed by lawful authority, a consideration that has occupied a prominent place in the legislation of congress from an early day."

In *Knight v. United States Land Ass'n,* 142 U. S., 161, the court said: "It is a well-settled rule of law that the power to make and correct surveys of the public lands belongs exclusively to the political department of the government, and that the action of that department, within the scope of its authority, is unassailable in the courts except by a direct proceeding."

In *Cragin v. Powell,* 128 U. S., 691, is the following: "That the power to make and correct surveys of the public lands belongs to the political department of the government and that, whilst the lands are subject to the supervision of the general land office, the decisions of that bureau in all such cases, like that of other special tribunals upon matters within their exclusive jurisdiction, are unassailable by the courts, except by a direct proceeding; and that the latter have no concurrent or original power to make similar corrections, if not an elementary principle of our land law, is settled by such a mass of decisions of this court that its mere statement is sufficient."

A large number of cases are cited by the court in support of this rule.

Judge Catron, in *Haydel v. Dufresne,* 17 How. [U. S.], 22, 30, gives the reason for this rule in the following language: "Great confusion and litigation would ensue if the judicial tribunals, state and federal, were permitted to interfere and overthrow the public surveys on no other ground than an opinion that they could have the work in the field better done, and divisions more equitably made, than the department of public lands could do."

Justice Bradley, in *Mitchell v. Smale,* 140 U. S., 406, discusses the question of what passes to the grantee of a tract bounded by a meandered line and the right of the gov-

ernment to correct its surveys in the following language: "Our general views with regard to the effect of patents granted for lands around the margin of a non-navigable lake, and shown by the plat referred to therein to bound on the lake, were expressed in the preceding case of *Hardin v. Jordan* [140 U. S., 371], and need not be repeated here. We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more nor less than taking from the first grantee a most valuable, and often the most valuable, part of his grant. Plenty of speculators will always be found, as such property increases in value, to enter it and deprive the proper owner of its enjoyment; and to place such persons in possession under a new survey and grant, and put the original grantee of the adjoining property to his action of ejectment and plenary proof of his own title, is a cause of vexatious litigation which ought not to be created or sanctioned. The pretense for making such surveys, arising from the fact that strips and tongues of land are found to project into the water beyond the meander line run for the purpose of getting its general contour, and of measuring the quantity to be paid for, will always exist, since such irregular projections do always, or in most cases, exist. The difficulty of following the edge or margin of such projections, and all the various sinuosities of the water line, is the very occasion and cause of running the meander line, which by its exclusions and inclusions of such irregularities of contour produces an average result closely approximating to the truth as to the quantity of upland contained in the fractional lots bordering on the lake or stream. The official plat made from such survey does not show the meander line, but shows the general form of the lake deduced therefrom, and the surrounding fractional lots adjoining and bordering on the same. The patents when issued refer to this plat for identification of the lots conveyed, and are equivalent to and have the legal

effect of a declaration that they extend to and are bounded by the lake or stream. Such lake or stream itself, as a natural object or monument, is virtually and truly one of the calls of the description or boundary of the premises conveyed; and all the legal consequences of such a boundary, in the matter of riparian rights and title to land under water, regularly follow. We do not mean to say that, in running a pretended meander line, the surveyor may not make a plain and obvious mistake, or be guilty of a palpable fraud; in which case the government would have the right to recall the survey, and have it corrected by the courts, or in some other way. Cases have happened in which, by mistake, the meander line described by a surveyor in the field-notes of his survey did not approach the water line intended to be portrayed. Such mistakes, of course, do not bind the government. Nor do we mean to say that, in granting lands bordering on a non-navigable lake or stream, the authorities might not formerly, by express words, have limited the granted premises to the water's edge, and reserved the right to survey and grant out the lake or river bottom to other parties. But since the grant to the respective states of all swamp and overflowed lands therein, this can not be done."

It will be seen from these cases that in the federal courts, at least, the plat of a government survey, after having been approved by the land department, is, in an action between individuals, conclusive. If such a plat shows a meander line running along the bank of a stream, this is conclusive that the stream is the boundary line, and no evidence will be received tending to show that a mistake had been made in the survey, and that a body of unsurveyed land was left between the meander line and the bank.

It is claimed, however, that *Lammers v. Nissen*, 4 Nebr., 245, establishes a different rule in this state. We do not think so, and an examination of the facts will show that there is nothing inconsistent with the holding of this court in that case and the holding of the supreme court of the

United States in the cases above cited. What were the facts? In 1861, Lammers entered at the United States land office lot 1, in section 12, township 33, range 1, and received a patent therefor. The plat of the original survey of this lot shows that it was bounded by the bank of the Missouri river; and he claimed title to the river bank, and brought his action in equity to restrain the defendants from cutting timber on land lying between the meander line of his lot and the river bank, to which he made claim as accretions to his land. The evidence established that, at the time the survey was made, from eight hundred to one thousand acres lay between the meander line of the plaintiff's lot and the bank of the Missouri river, which was left unsurveyed. This apparently arose from the surveyor mistaking a slough for a channel of the river. When the attention of the officers of the land department of the general government was called to this unsurveyed land, a survey was ordered and made, and the government sold the land to the defendants, who produced patents therefor. Upon those facts the finding was for the defendants, and this court said: "Although, as to public lands of the United States, a meandered line is generally considered as following the windings of a stream, yet the question whether it does so or not may be determined by evidence *aliunde*. The mere fact that it is run and designated upon the plats as a meandered line is not conclusive against the government." The holding went only to establish that the government itself was not concluded by the lines established by its surveyors, and that in an action brought by a purchaser claiming that his grant brought him to the bank of the river, the government, or a purchaser claiming by grant from the government, may show not merely that the survey and plat under which the plaintiff claimed was incorrect, but that the government had, through its proper officers, asserted title to the lands claimed by the plaintiff, had the same surveyed and platted, and granted them by letters patent to the defendants. As we read and understand the opinion it only holds that the government may

correct mistakes of its surveyors, and that an approved plat of the survey of public lands does not conclude the government in a contest between it and a purchaser who bought with reference to the plat.

*Bissell v. Fletcher,* 19 Nebr., 725, was a case of the same character. In the first report of the case the fact that the defendant claimed title to the land in controversy by purchase from the United States is not made clearly to appear, but this is made plain by the statement of Judge MAXWELL on the rehearing had in the case, and reported in 27 Nebr., 582. The statement is as follows: "The matter in dispute is the boundaries of lot 3, section 31, town 2, range 18 west, in Harlan county. This lot is shown, by the plat and patent under which the plaintiff claims, to contain 52 60-100 acres. This amount of land he is in the undisputed possession of, but he claims that he is also entitled to a large quantity of land as an accretion, but which the United States has caused to be surveyed and sold to the defendants or their grantors, so that the question in controversy is between two persons who have purchased and paid for distinct tracts of land from the United States government."

So far, then, we have no case in this state holding or intimating that a trespasser might enter on lands claimed by a purchaser from the United States, and shown by the plat of the survey to be covered by his patent, and, when proceeded against for such trespass, show in defense, that the government plat is incorrect, and that the land claimed by the plaintiff is not in fact covered by his grant. It was not until the case of *Harrison v. Stipes,* 34 Nebr., 431, that a case arose presenting these features, and the statement of the case made by Judge NORVAL leaves us to doubt whether that case presented the precise question. Harrison, the plaintiff, brought ejectment to recover from the defendant certain lands which he claimed as accretions to a certain irregular forty. The defense interposed was that the land in dispute was not included in the meandered line of plaintiff's land, but lay between such line and the

river. The following is Judge NORVAL's statement relating
to what was shown by the plat of the survey: "It appears
that said fractional section 8 was surveyed by the United
States in 1856. The east and south boundaries of the sec-
tion consisted of a meander line near the west bank of the
Missouri river." If this is an accurate statement of the
case, then the question now under consideration did not
arise in the case, as the meandered line did not run along
the river bank, making that bank the boundary line, but
it was "near" the bank, but how near or how far therefrom
does not appear from anything in the statement or the
opinion. If the meandered line did not extend to and
along the river bank, it needs no argument to demonstrate
that the plaintiff could not claim title to accretions formed
by the river against the bank, and that he should fail in
his action. But again, it is apparent from the opinion
that the court did not intend to establish a rule differing
from that announced in *Lammers v. Nissen* and *Bissell
v. Fletcher.* In the opinion it is said: "The plaintiff's
claim to any portion of the strip lying between the mean-
der line and the present channel of the river is not well
founded for the reason that it is not an accretion to the
plaintiff's land. The case falls within the rule announced
in *Lammers v. Nissen,* 4 Nebr., 245." In the fact that the
defendant, Stipes, was not claiming title to the land occu-
pied by him by title derived from the United States, the
case does not come within the facts shown in *Lammers
v. Nissen;* and, if it falls within the rule of that case, it
must be only because the plat of the survey showed upon
its face that the meandered line did not extend along the
river bank, and that the river bank was not the plaintiff's
boundary line.

This court has not committed itself to the doctrine that
one without claim of legal title may enter on land shown
by the government plat of the survey to be included in a
tract patented by the government to another, and hold
possession thereof as against the party claiming under
the patent, upon a showing that the plat of the govern-

ment survey was incorrect, and that an accurate survey would not include the land. We are not advised of any case in this state or elsewhere, which allows the government plat to be contradicted or impeached, except in a direct proceeding brought for that purpose, and the reasons for the rule are so many and important that no departure therefrom ought to be allowed.

In the present instance the record discloses that Whitaker made application to the land department of the general government for a survey of this island, and was informed by the commissioner of the land office, in a communication under date of May 26, 1897, that the department had caused an investigation to be made in 1895, relating to the rights of the government to this island and some others in the vicinity, and had determined that the islands were connected with land which had been previously surveyed and disposed of by the government, and that the secretary of the interior, in his letter of February 18, 1895, concurred in. the recommendation of the commissioner that no further action looking to the survey of any of the alleged islands be taken. The government has investigated and disclaimed any interest in the island, giving as reason therefor that it had conveyed its title; and there can be no question of doubt that, as between the claims of Whitaker and of McBride and Kilgore, the latter have a right to have their title quieted as against his demand.

We do not wish to be understood as undertaking in this opinion to determine the rights of anyone except the parties to the record, or to have the impression go out that any claims of the state to the bed of the Platte river, or to any unsurveyed islands therein, are intended to be affected in any manner by what has been said. We have only aimed to settle the rights of the parties as among themselves, and, if the state should hereafter present any claim of ownership to the bed of the river, we desire to be left free to determine the question as the merits of the case may demand, and without reference to anything that may

have been said in the foregoing opinion. It is settled by the decisions of the supreme court of the United States that a grant by the general government of public lands bounded on streams releases the government title to the middle of the stream, unless some reservation is contained in the grant, but whether the title inures to the state in which the land lies, or to the grantee of the government, depends upon the law of the state. *Hardin v. Jordan*, 140 U. S., 371. As the question of the rights of the state has not been presented in this case, we reserve that question until a case arises in which we may have the benefit of the argument of counsel; it being one of too much importance to be determined without a full discussion. That as against everyone but the state, or those claiming through the state, McBride and Kilgore have the better right to the land in dispute, seems to us too plain for discussion; and that they are entitled to relief as against Whitaker, a naked trespasser on their prior undisputed and peaceable possession, is not a question for debate.

We recommend that the decree of the district court be reversed, and the case remanded with directions to enter a decree quieting the title to the north half of the island in dispute in the defendant Kilgore, and to the south half thereof in the plaintiff, McBride.

AMES and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion the decree of the district court is reversed, and the cause remanded with directions to enter a decree quieting the title to the north half of the island in dispute in the defendant Kilgore, and to the south half thereof in the plaintiff, McBride.

JUDGMENT ACCORDINGLY.

NOTE.—*Riparian Rights.—Common Law.—Statute.*—Riparian is an adjective, defined, "of or pertaining to the bank of a river." It is from the Latin *riparius* of the same meaning, which came from *ripa*, river bank, also applied in a secondary meaning to the sea-shore. The derivation of the latter word is doubtful. Century Dictionary; Harper's Latin Dictionary.

Each riparian proprietor owns that portion of the bed of the river (not navigable) which is adjoining his land *usque ad filum aquæ;* or, in English words, to the thread or central line of the stream. Rawle, Bouvier's Law Dictionary, vol. II., 931. Where land lying on each side of a river was owned by the tenants in common, and they made partition of the same, by assigning the land on one side of the river to one, and that on the other side to another, it was held that the two tracts were to be considered as separated by the thread or central line of the river. *King v. King,* 7 Mass., 495.

At common law the right of the owner of lands along the shore of the sea, or of navigable waters in which the tide ebbs and flows, extends only to the shore or ordinary high-water mark; the shore, which is the line between ordinary high-water mark and ordinary low-water mark, and the lands under water, belong to the state, and are part of the sovereignty. *Gough v. Bell,* 2 Zabriskie [N. J. Law], 441.

In New Jersey the owner of lands along the shore of tide waters may extend his improvements by wharves or filling up, over the shore in front of his lands to low-water mark, unless prevented by the state, provided he do it so as not to interfere injuriously with navigation; and when he has so improved or reclaimed the shore, his title will extend to actual high-water mark; and, the state can not grant the shore so recovered, or appropriate it to public use without adequate compensation. *Gough v. Bell,* 2 Zabriskie [N. J. Law], 441.

Lateral contact is as good as vertical. *Lyon v. Fishmongers' Co.,* Law Reports, 1 App. Cases [Eng.], 662, 682.

A mere possessor of unsurveyed government land has no riparian rights to the use of a stream of water flowing through it. *Lake v. Tolles,* 8 Nev., 285, 286.

The person entitled to the exclusive right to possess and use land abutting on a navigable lake or river, is also (though he does not own the fee) entitled to enjoy the riparian rights incident to the land. *Hanford v. St. Paul & D. R. Co.,* 43 Minn., 104.

The right of a riparian proprietor upon navigable waters to improve, reclaim and occupy the submerged lands out to the point of navigability, although originally incident to the riparian estate, may be separated therefrom, and be transferred to and enjoyed by persons having no interest in the original riparian estate. *Hanford v. St. Paul & D. R. Co.,* 43 Minn., 104. This case overrules another in 38 Minnesota.

A mere right of way along the bank, reserved in a grant of land bounded by a river, being a mere easement, would not deprive the grantee of his rights as a riparian proprietor. *Indianapolis Water Co. v. American Strawboard Co.,* 53 Fed. Rep., 970, 974.

When an easement is granted to the public, upon the margin of a navigable stream, the right to use and treat it as a landing is undoubted. If the banks of a navigable river are dedicated, the dedicator has no interest in the bed of the stream which he can

reserve, to the prejudice of the public easement over it. *Godfrey v. City of Alton,* 12 Ill., 29.

*Meander-line.*—The English words meander and meander-line are derived, like bowie-knife, boycott, fuchsia, gerrymander, macadamize, macintosh, maverick, quixotic, ruckerize and seltzer, from a proper name. The Mæandrus (Latin), Maiandros (Greek), was the name of a river of Asia Minor flowing into the Icarian sea. In its course it was said to describe the form of five Greek letters, and to have suggested to Dædalus the construction of the Cretan labyrinth. This history of the words would seem to obviate the necessity for their definition.

*Accretion.*—When grants of land border on running water, and the banks are changed by accretion, the riparian owner's boundary-line still remains the stream, although during the years, by the accretion, the actual area of his possessions may vary. *Nebraska v. Iowa,* 143 U. S., 359, 360. But when the boundary stream suddenly abandons its old bed and seeks a new course by the process known as avulsion the boundary remains as it was, in the centre of the old channel. *Nebraska v. Iowa,* 143 U. S., 359, 361. The law of accretion is founded upon the legal maxim, *De minimus non curat lex. Lammers v. Nissen,* 4 Nebr., 245; 25 United States Supreme Court Reports, Lawyers' Edition, page 562.

*As Between States.*—*Missouri v. Kentucky,* 11 Wall. [U. S.], 395, and *Nebraska v. Iowa, supra;* the former case cited is the celebrated *Wolf Island Case.* See, also, *De Long v. Olsen,* 63 Nebr., 327.

A case is now pending before the supreme court of the United States, entitled *The State of Kansas v. The State of Colorado.* Kansas filed a complaint charging that the Arkansas river, having its source and drainage basin in Colorado, flowed into and through Kansas; that the river was an interstate river navigable in fact through Arkansas, and treated by the United States surveys and by the executive departments as a navigable river in Kansas; that the state of Colorado has by irrigation ditches and reservoirs diverted most of the water from the river, and claims the right to divert all. From the allegations of the bill, it appears, *inter alia,* the Arkansas river, after flowing 300 miles and draining 22,000 square miles of territory, an area as large as that of New Hampshire, Massachusetts and Connecticut combined, enters the state of Kansas at an elevation of 3,300 feet above sea level; that this river flows for 210 miles through Kansas, and its valley contains a population of more than 50,000 farmers and an urban population about equally large; that the river's tributaries in Kansas are small and few in number, and the rainfall is light; that the value of farming property in the Kansas valley upon which crops are grown is $50,000,000; that the fertility of the Kansas valley depends upon the flow of this river through Kansas; that among those engaged in so diverting water and threatening further diversion is the state of Colorado, by legislation and otherwise, and among the riparian land owners in Kansas is the state of Kansas; that other

McBride v. Whitaker.

riparian owners injured can not reach the principal offender; that suits by single riparian owners would involve a multiplicity of suits. In this case the supreme court of the United States has overruled a demurrer to its jurisdiction.

Grants by the United States of their public lands bounded on streams and other waters, made without reservation or restriction, are to be construed as to their effect, according to the law of the state in which the land lies. *Hardin v. Jordan*, 140 U. S., 371, and authorities there cited.

Meander-line along the Missouri river. *De Long v. Olsen*, 63 Nebr., 327.

*Division of Accretions.*—The supreme court of Massachusetts laid down the following rule as to the division of accretion among riparian proprietors: "(1.) Measure the whole extent of their ancient line on the river and ascertain how many feet each proprietor owned on this line; (2) divide the newly formed river line into equal parts, and appropriate to each proprietor as many of these parts as he owned feet, yards or rods on the old line; and (3) draw lines from the points at which the proprietors respectively bordered on the old, to the points thus determined as the points of division on the newly formed shore. Shaw, C. J., in *Deerfield v. Arms*, 17 Pick. [Mass.], 41, 45, 58 Am. Dec., 276. This rule was upheld in *Knight v. Wilder*, 2 Cush. [Mass.], 199, 209; *Hopkins Academy v. Dickinson*, 9 Cush. [Mass.], 544; *Wonson v. Wonson*, 14 Allen [Mass.], 71, 85; *Johnston v. Jones*, 1 Black [U. S.], 209. A different rule is laid down in a subsequent case; viz., a division by straight lines projected by extending the division lines on the ancient boundary to the outer boundary. In this case the original estates were upon a headland. *Winnisimmet Co. v. Wyman*, 11 Allen [Mass.], 432, 438. See rule laid down in *Jones v. Johnston*, 18 How. [U. S.], 150.

The following rule was laid down in the supreme court of Illinois: "Measure the entire front as it was found to be when the lots were laid out, and note the aggregate number of feet frontage, as well as that of each lot; then measure a line down as nearly as may be with the middle thread of so much of the stream as lies opposite the shore-line so measured; then divide the thread line into as many equal parts as there are lineal feet in the shore line, giving to each proprietor as many of these parts as his property measures feet on the shore line; and then complete the division by drawing lines between the points, designating the lot or parcel belonging to each proprietor, both upon the shore and river lines." *Kehr v. Snyder*, 114 Ill., 313, 316, 55 Am. Rep., 866, 867. This is the *Cahokia Commons Case*.

The reason for the rule laid down in these cases is that the riparian proprietor has an easement in his water-frontage, and the object of the rule is to prevent the easement being sacrificed to land measured by surface. Once a riparian proprietor always so. *Kraut v. Crawford*, 18 Ia., 549.

In 1871 the supreme court of Kentucky held that the division of accretion among riparian owners was to be ascertained by extend-

ing the original river frontage of the respective lots as nearly as practicable at right angles with the course of the river to the thread of the stream. *Miller v. Hepburn,* 8 Bush [Ky.], 326, 330, 332. In laying down this rule Hardin, J., claimed to follow, substantially, *Knight v. Wilder, supra; Lorman v. Benson,* 8 Mich., 18; *Rice v. Ruddiman,* 10 Mich., 125. Examine *Emerson v. Taylor,* 9 Me., 42.

*Quære.*—Should a different rule obtain, as to the division of accretion, where land is described by metes and bounds? That is to say, if a man in Nebraska owns a fractional quarter section bordering on a stream should the quarter section line be simply extended through the accretion? In Massachusetts land is described by metes and bounds, in Illinois by square miles or sections. The Massachusetts rule and the Illinois rule are not identical, though founded on the same principle.—W. F. B.