THEODORE OSTERMAN ET AL., APPELLANTS, V. CENTRAL NEBRASKA PUBLIC POWER AND IRRIGATION DISTRICT, APPELLEE.

FILED JUNE 29, 1936. No. 29780.

P. S. Heaton, E. J. Patterson, Cook & Cook, S. S. Diedrichs, L. C. Davis, B. J. Cunningham, Hoagland, Carr & Hoagland, Prince & Prince, Cleary, Suhr & Davis, Matschullat, Matschullat & White and R. H. Beatty, for appellants.

Paul F. Good, Ralph O. Canaday and Stiner & Boslaugh, contra.

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and CARTER, JJ., and YEAGER, District Judge.

EBERLY, J.

This is an appeal to this court in a special statutory proceeding before the department of roads and irrigation, under the provisions of chapter 81, art. 63, Comp. St. 1929 (section 81-6301 *et seq.*). The final orders entered by that department, here sought to be reviewed, were orders which granted to the Central Nebraska Public Power and Irrigation District (hereinafter designated as the "Tri-County District") four applications for allowance of water rights on the North Platte and Platte rivers, viz.:

(1) Application No. 2351, for storage of 509,500-acre feet of the waters of the Platte river in two reservoirs to be constructed and known, respectively, as the upper and lower Plum creek reservoirs, situated in the north part of Gosper county, Nebraska; the diversion works under this application are planned to be located in the Platte river in Lincoln county, Nebraska, below the junction of the North and South Platte rivers, and above Brady Island. This will hereafter be referred to as the "Maxwell Diversion."

(2) Application No. 2354, for use of waters diverted at the Maxwell Diversion point, between that point and the mouth of Plum creek at various points for generation of hydro-electric power, and further, after such use, in part to be so disposed of as to be added to waters available for irrigation of the land hereinafter described.

(3) Application No. 2355, for the diversion of direct flow waters at the rate of 3,571 cubic feet per second for irrigation purposes in Gosper, Phelps, Kearney and Adams counties, in Nebraska. For that purpose the diversion points were fixed as Maxwell Diversion, above described, to use the same canal as will be used to carry water into the Plum creek reservoirs; a diversion from the Platte river in Gosper county, Nebraska, in section 2, township 8, range 21, close to the mouth of Plum creek; and a diversion

from the Platte river in section 17, township 7, range 51, Kearney county, a short distance below the city of Kearney.

(4) Application No. 2374, for the construction of a channel or "on river" reservoir in the bed of the North Platte river at a point a few miles above Keystone, in Keith county, Nebraska.

The appellants in this case are too numerous to be named in this opinion. With respect to the character of their claims, these parties naturally fall into one of two divisions, viz.: (1) "Appropriators," whose rights arise out of, and are based upon, the state irrigation laws; and (2) "riparians," whose claims are incident to, and arise out of, ownership and possession of lands bordering upon the Platte river or through which it runs. For convenience and brevity, the terms "appropriators" and "riparians," as thus defined, will hereafter be employed in this opinion as denominating the appellants in this suit.

Accepting the suggestion of counsel for appellants, made in argument at the bar of this court, we have concluded to narrow the issues to the single controlling question as to the right of the Tri-County District, under the restrictions of our laws, pursuant to the privileges thus granted and received by it, to annually assemble and concentrate the waters of the Platte river in the amount of 600,000-acre feet, and transport 60 per cent. of same through and across the divide or watershed which separates the Platte river system from the basins of the Blue and Republican rivers (both tributaries of the Kansas river and constituting a part of its system), and therewith irrigate lands situated wholly outside the Platte river valley and beyond the watershed thereof.

This procedure we adopt because of the diversity of interests, and parties representing the same, as disclosed by the record in this case, and is expressly without prejudice to the rights of all parties as to their several contentions made in this action, but not now expressly determined.

The uncontradicted evidence of the chief engineer, testifying as to the disposition of the waters to be controlled,

accumulated, and applied in power and irrigation, by and through the water privileges covered by the four applications here in suit, in part, is as follows:

"Q. How much in the original plans and as revised, how many acres do you plan to irrigate? A. 500,000. Q. And what part of that acreage is north of the divide south of the Platte river? A. Approximately 60 per cent. south of what we call the ridge and 40 per cent. north. Q. That would be about 300,000 acres on the south side and 200,000 acres on the north side of the ridge? A. Yes, sir. Q. And how much water do you propose in those plans, acre feet of water, do you propose to take each year from the Platte river? A. We figure on applying one-acre foot per acre on the land. Q. So you will take 500,000-acre feet of water? A. Take a little more than that because there will be some seepage and evaporation losses. Q. Do you intend to apply the same one acre foot on the land on the north side that you do to the land on the south side of the divide? A. Yes, sir. Q. And you feel that will be sufficient south side of the divide? A. Yes, sir; that matter has been gone into very thoroughly and reports are all on file. * * * Q. Just describe generally what the arrangement is in reference to the operation of the reservoirs and power plants. A. First, have a diversion east of North Platte, carry it down Plum creek and dump approximately 80 feet there and have a spill-way back into the Platte river where we can take all the water down the canal or can spill part into the river and carry that down Midway canyon, dam that and have a tunnel to carry the water over to Plum creek and north to Elwood, have a dam approximately 115 feet high and with the excavation gives us 140 drop for the power plant and below that have a second reservoir with a dam of about 115 feet high and a drop of 140 feet and that water is turned back into Plum creek and carried on down to our canals for irrigation and with a cross-over structure we can turn it back into the river. * * * Q. What is your estimate of the amount of water you are going to take out of the Platte river? A. For irrigation? Q. Yes? A.

For irrigation it will run about one and three tenths acre foot per acre on the land and if we put in the Plum creek reservoir we will have an additional loss for evaporation out of that. * * * Q. Then instead of 500,000 you will take out about 700,000-acre feet? A. Anyway 600,000-acre feet. * * * Q. Of this 600,000 that you propose to take out of the Platte river, how much do you propose to take over onto the south divide between the Republican and the Platte? A. Under irrigation about 60 per cent. south of the divide, at least more than half. * * * Q. * * * That will mean practically 360 or 400,000-acre feet taken out of the Platte valley for good, wouldn't it? A. Yes; I would consider it that way."

In view of this testimony, as outlined above, the "canals" to be constructed in the accomplishment of the ultimate object of this project, whether primarily devoted to the development of power, for storage, or for the application of the waters to land by direct irrigation, must be deemed "irrigation canals," as defined by our statute. Comp. St. 1929, sec. 46-507. This section provides: "Any canal constructed for the purpose of developing water power, or any other useful purpose, and from which water can be taken for irrigation, is hereby declared to be an 'irrigation canal' and all laws relating to irrigation canals shall be deemed applicable thereto."

As a preliminary question, the right to relief by the "riparians" is, in effect, challenged by the Tri-County District, substantially for the reason that the Platte river in Nebraska being an "interstate stream," along the banks of which meander lines have been run by the federal government in its survey of the public lands, this precludes the attachment or existence of riparian rights in the waters thereof. Obviously a person may not be heard to complain, either in a court of law or before an administrative tribunal, as to the infringement of a right which in fact he does not possess, nor of an alleged injury that occasions the complainant no damage.

This proposition necessitates a consideration of the situ-

ation of the riparian objectors. The Platte river, on which they reside, is formed by the junction of the North and South Platte rivers near North Platte, Nebraska, and extends from that point to the eastern boundary of the state. The valley which borders this stream is level, and has an easterly slope of from five to six feet per mile. The bed of the Platte river is sandy. To the north of the Platte river is situated a natural reservoir in the sand hills affording a temporary storage in excess of 500,000,000-acre feet. These waters gradually escape to the Platte valley by subterranean outlets and join similar waters received by the Platte valley from the tributaries of that stream. On the north side of the Platte this body of water proceeds easterly in a definite flow substantially conforming to the Platte river channel, and substantially underlying the entire valley. On the south side of the channel while the general direction of the mass of this flowing body of water still roughly conforms to the direction of the Platte river channel, yet some 56,000-acre feet are estimated as being annually diverted therefrom and passing through and under the watershed to the Republican and Blue rivers. This subterranean flow retained in the Platte valley, in its course, continues relatively close to the top of the soil. At times, in a measure it receives replenishment from rains, from the waters carried in the channel of the river, and constitutes natural subirrigation for the entire valley, and especially the lands situated contiguous to the Platte river channel.

The evidence in the record is without dispute that prior to the irrigation development in the Platte river basin, due to this practically unlimited subterranean flow, crops of corn and small grain, hay and alfalfa were assured irrespective of the dryness of the season. The water carried by the channel was ample for domestic use, and was even sufficient to temper the hot winds of the summer season. This situation made cultivated portions of the Platte valley a beautiful ribbon of green extending across the state. Truly, this river, in the language of Mr. Justice Holmes in

*New Jersey v. New York,* 283 U. S. 336, 342, "is more than an amenity, it is a treasure." In this treasure more than 100,000 people have by residence within its watershed a direct and substantial interest. It would be a sad commentary on our political organization, upon the department of roads and irrigation, and upon this reviewing court, if in rationing this necessity of life this beautiful valley should be left with a dry river bed and ruined farms because of any mistaken theory that the protection of its natural fertility did not constitute a public interest within the policy of our laws.

The riparian objectors in this proceeding are representatives of titles initiated by settlement as early as 1857, and for which government patents had been issued earlier than 1870. Their lands bordered on the Platte river channel, and, at common law, were entitled to the customary rights as such. It is obvious that the challenge by the Tri-County District to the competency of these riparians is based on certain statements in the opinion of this court in *Crawford Co. v. Hathaway,* 67 Neb. 325, 93 N. W. 781. These statements relate to the application of the rights of riparian proprietors to the larger streams of the state, such as may be classed as "interstate" rivers, and along the banks of which meander lines have been run by the government in its survey of public lands.

The opinion in *Crawford Co. v. Hathaway, supra,* was released February 4, 1903. The author was Justice Holcomb. The *locus in quo* was the White river, which this opinion thus refers to (p. 350) : "The stream is a narrow one, ordinarily flowing but a small volume of water, the bed thereof belonging to the contiguous landowner." It follows that the subject-matter then before this court in the *Hathaway* case in no manner presented or involved the question of a "meandered stream." As to the question thus involved, Judge Holcomb further says: "A final determination of the question, however, is not here made, as this should be left to be decided in a proper case, where the subject is fairly presented and considered after oppor-

tunity for thorough investigation." At the close of the opinion (p. 375) Judge Holcomb states: "We have herein discussed some matters having an indirect bearing on the main issues involved in the case. The court, however, must not be understood as being committed to any proposition not expressly decided." The point under consideration appears in paragraph 8 of the syllabus in the following language: "As to those streams of water flowing through the state which may be classed as interstate rivers, and along the banks of which meander lines have been run by the government in its survey of the public lands, the question is left open as to whether or not the waters of such streams may not be treated as waters of navigable rivers, to which riparian rights of an adjoining landowner would not attach as against the right of the public to use the waters thereof by its appropriation and application to beneficial purposes."

Sedgwick, J., in a separate opinion in such *Hathaway* case, says, in part: "The question whether the law of riparian ownership applies to 'the larger streams of the state' appears to depend upon whether the owner of the land is held to own to the thread of the stream or only to the banks, and the former was determined to be the law of this state in *McBride v. Whitaker*, 65 Neb. 137. I am not satisfied with the discussion of the extent of lands that may be called riparian, and do not see how it is involved in this case."

The opinion in *McBride v. Whitaker*, 65 Neb. 137, 90 N. W. 966, was handed down June 4, 1902. It involved Platte river lands "bounded by the river bank, as indicated by a meandered line following along the bank of the stream as shown upon the plat." In that case, the following principles were approved by an undivided court:

"Grants of land bounded upon a river not navigable carry with them the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the bank or margin of the river; the rule of the common law being that pro-

prietors of land adjoining public rivers not affected by the flow of the tide own the soil *ad filum aquæ.*

"A grant of land bounded upon a nonnavigable river, made by the general government with reference to the plat of the survey, which shows a meandered line along the river bank, conveys to the grantce title to such unsurveyed islands or parts of islands as lie within that limit."

At the time the opinion in the *Hathaway* case was handed down, an appeal in *McBride v. Whitaker, supra,* was pending in the supreme court of the United States. This appeal was determined on April 10, 1905, by the affirmance in all respects of the judgment of the supreme court of Nebraska. See *Whitaker v. McBride,* 197 U. S. 510. Justice Brewer of the supreme court of the United States, in this case, said in part (p. 512) : "A meander line is not a line of boundary, but one designed to point out the sinuosity of the bank or shore, and a means of ascertaining the quantity of land in the fraction which is to be paid for by the purchaser. *Railroad Co. v. Schurmeir,* 7 Wall. (U. S.) 272; *Hardin v. Jordan,* 140 U. S. 371; *Horne v. Smith,* 159 U. S. 40."

It follows that abutting owners on the Platte river, when they obtained title from the government which was initiated prior to 1889, also acquired title to its bed and were entitled to the rights of riparian owners of land and to the use of the waters flowing therein.

But, an additional reason for awarding these riparians the right to appear in this present proceeding is to be found in their situation. A peculiarly valuable portion of their lands is the subirrigation which, as we have seen, nature constituted a part thereof. While subterranean channels may not exist or be completely identified, these subterranean waters come to and flow under their lands from definite sources and en route to definite termini. The lateral boundaries of this body of water may not be certainly located, but its existence as a body of water finding its way through the soil of the riparian land is completely

established. We are committed to the rule: "The owner of land is entitled to appropriate subterranean waters found under his land, but his use thereof must be reasonable, and not injurious to others who have substantial rights in such waters." *Olson v. City of Wahoo*, 124 Neb. 802, 248 N. W. 304.

It follows that subterranean irrigation is a valuable right, and that in this case the riparians are competent by interest to participate in this proceeding and challenge the right of the Tri-County District to sustain its applications here in suit.

Recurring to the determinative question, we find the objectors, who have been herein denominated "appropriators," and those who are designated as "riparians" united in interest, and also united in opposing the contentions of the Tri-County District.

It is to be remembered that Nebraska was first settled along the eastern borders and in its river valleys. These lands were not arid lands, nor, indeed, may the entire state be properly designated as an arid state.

Accordingly, in 1866 there was duly enacted by the territorial legislature, as section 1, chapter VII of the Revised Statutes of that year, the following: "So much of the common law of England as is applicable, and not inconsistent with the Constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory, is adopted, and declared to be law within said territory." 2 Complete Session Laws of Nebraska, 1866-1877, p. 12. This act, in substance, continues in full force and effect. Comp. St. 1929, sec. 49-101.

In compliance with the terms of this enactment, this court has consistently supported this doctrine: "The common-law rules as to the rights and duties of riparian owners are in force in every part of the state, except as altered or modified by statutes." *Meng v. Coffee*, 67 Neb. 500, 93 N. W. 713. See, also, *Crawford Co. v. Hathaway*, 67 Neb. 325, 93 N. W. 781.

The principle was also clearly announced, and consistently maintained, that "The purpose of the law as to use of water by riparian owners is to secure equality therein, as near as may be, to each, by requiring each to exercise his rights reasonably, and with due regard to the right of other riparian owners to apply the water to the same or other purposes." *Meng v. Coffee,* 67 Neb. 500, 93 N. W. 713.

The language of the above rule necessarily implies that the right to use water at common law is limited strictly to riparian lands. This is in accord with the weight of authority. 3 Farnham, Waters and Water Rights, p. 1902. This necessitates the further conclusion that at common law there was in general no right to transport waters beyond or over the divide or watershed that inclosed the source from which obtained.

However, the Tri-County District contends that section 46-508, Comp. St. 1929, permits diversion of water from one watershed to another. In the light of legislative history, we are unable to agree with this contention. Our first enactment on the subject of irrigation is chapter 68, Laws 1889. This act, entitled "An act to provide for water rights and irrigation, and to regulate the right to the use of water for agricultural and manufacturing purposes," etc., embraced a complete drainage code. It is to be noted that section 1, art. 1 of the act, provided:

"The right of the use of running water, flowing in a river or stream or down a canyon, or ravine, may be acquired by appropriation by any person or persons, company or corporation organized under the laws of the state of Nebraska; provided, that in all streams not more than fifty feet in width, the rights of the riparian proprietors are not affected by the provisions of this act."

Section 6 of the same article is as follows:

"The water appropriated from a river or stream shall not be turned or permitted to run into the waters or channel of any other river or stream than that from which it is taken or appropriated."

This has been said to have been adopted from California.

It appears at the time of the enactment of this statute the law in California on this subject was substantially that, while the use of waters of streams for irrigation is permitted, the riparian proprietor is recognized as having the superior right, and the waters are not permitted to be diverted by the irrigators beyond the watershed; but the surplus is to be returned to the original stream. 1 Wiel, Water Rights, p. 849; 1 Kinney, Irrigation, p. 782; 2 Farnham, Waters and Water Rights, p. 1572; 3 Farnham, Waters and Water Rights, p. 1903; *Wiggins v. Muscupiabe Land & Water Co.*, 113 Cal. 182, 45 Pac. 160; *Bathgate v. Irvine*, 126 Cal. 135, 58 Pac. 442; *Southern California Investment Co. v. Wilshire*, 144 Cal. 68, 77 Pac. 767; *Anaheim Union Water Co. v. Fuller*, 150 Cal. 327, 88 Pac. 978; *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571; *Watkins Land Co. v. Clements*, 98 Tex. 578, 86 S. W. 733; *Matagorda Canal Co. v. Markham Irrigation Co.*, 154 S. W. (Tex. Civ. App.) 1176.

It is obvious, in view of the source of the enactment, and the express terms of section 6, art. 1, that the act of 1889 in no manner authorized the conveyance of waters over and beyond the watershed for the purposes of irrigation.

Four years later the legislature of 1893 enacted an act "to promote the development of water power for manufacturing and other industrial purposes," and to amend certain sections of the consolidated statutes of Nebraska of 1891. Laws 1893, ch. 40. By its terms, section 6, art. 1 of the irrigation law of 1889, was amended by attaching thereto an exception, in the following language: "Unless such stream exceeds in width one hundred (100) feet, in which event not more than seventy-five (75) per cent. of the regular flow shall be taken." This now appears as section 46-508, Comp. St. 1929.

In 1895, chapter 69 of the session laws of that year was duly enacted, which repealed the irrigation law of 1889, as amended. By its terms the law of Wyoming was largely adopted. However, six sections of the "Raynor's Irrigation

Law" (1889) were not repealed by the act of 1895, and one of these is section 6, article 1 of the law of 1889, as amended in 1893. However, the act of 1895 contained the following pertinent provisions:

Sec. 42. "The water of every natural stream not heretofore appropriated, within the state of Nebraska, is hereby declared to be the property of the public, and is dedicated to the use of the people of the state, subject to appropriation as heretofore provided."

Sec. 43. "The right to divert unappropriated waters of every natural stream for beneficial use shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purposes but when the waters of any natural stream are not sufficient for the use of all those desiring the use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have the preference over those using the same for manufacturing purposes."

Sec. 59. "The owner or owners of any irrigation ditch or canal shall carefully maintain the embankments thereof so as to prevent waste therefrom, and shall return the unused water from such ditch or canal with as little waste thereof as possible to the stream from which such water was taken or to the Missouri river."

It is obvious that section 59 quoted, which is now section 46-620, Comp. St. 1929, is not amendatory of section 6, art. 1, ch. 69, Laws 1889, as amended in 1893 (now section 46-508, Comp. St. 1929), but is to be regarded as part of the act of 1895, complete within itself, and having the force and effect of an additional regulation for the construction, maintenance and operation of irrigation canals. It is also obvious that the words "or to the Missouri river" can have no application to the issue to be determined in the instant case. So, also, as concerns section 42 (now section 46-502) and section 43 (now section 46-504), as well as section 46-508, the controlling principle of con-

struction is: "In accordance with the principle that the last expression of the legislative will is the law, in case of conflicting provisions in the same statute, or in different statutes, the last in point of time or order of arrangement prevails." 59 C. J. 999.

It follows that performance of the conditions imposed by section 46-620, Comp. St. 1929, is expressly made mandatory in the operation of all irrigation ditches, and in addition its requirements prescribe a necessary, practical limitation to the extent that water may be removed from the source of supply. Water unconfined will not run up hill. The divide or watershed must therefore not be crossed by an irrigation ditch or canal and the waters applied to lands whose situation is such that prevents the unused waters from being returned to the source from which they were taken. In fact, section 46-620 was in effect a substantial reenactment of section 6, art. 1, ch. 69, Laws 1889, because it is inconceivable that its prohibitions would ever be applied to any but unused waters. It is quite obvious that the legislative intent in both enactments was to preserve the unused waters for the benefit of the source from which obtained. These statutes are more than mere arbitrary commands. They evidence reason and purpose. They establish public policy on the subject of irrigation. Courts will consider the purpose of a statute as a whole, and seek to carry out, and not defeat, such purpose. *School District of Omaha v. Gass, ante,* p. 312, 267 N. W. 528.

Section 46-132, Comp. St. 1929, empowering irrigation districts to provide for drainage of lands embraced within their limits which are or have been subirrigated, and to return such drainage waters to the stream from which its canal is taken, in event the same are not again used for irrigation, is obviously another example of the legislative recognition of the established policy of the state.

It is manifest, therefore, that section 46-620, Comp. St. 1929, construed in connection with section 46-508, as an express regulation governing the operation of irrigation canals and ditches, necessarily implies such location and

construction of the matters regulated as will enable a full performance of the requirements specifically directed. This, as a practical matter, in view of existing conditions, necessarily limits the location of the canals to within the watershed of the stream that furnishes the source of supply.

It follows, therefore, that under the established policy of this state, water for irrigation and power purposes taken from the Platte river or its tributaries may not be lawfully diverted over and beyond the southern watershed of that stream and applied to lands situated without the basin of the Platte river; and that the department of roads and irrigation was wholly without authority to grant applications numbers 2351, 2354, 2355, and 2374, for that purpose. The orders of the department of roads and irrigation approving and granting the applications above enumerated are, therefore, each set aside, annulled, and revoked, and the cause is remanded to such department with directions, if desired, to grant leave to amend said applications by limiting the use of the waters taken thereunder to power purposes and to irrigations of lands situated within the Platte river watershed.

REVERSED.