CRAWFORD COMPANY, APPELLANT, V. HATHAWAY ET AL., APPELLEES.

FILED FEBRUARY 4, 1903.    No. 10,087.

1. **Use of Water:** DOCTRINE OF CIVIL LAW: PRIOR APPROPRIATION: BENEFICIAL USE: TERRITORY: LAWS IN FORCE IN LOUISIANA PURCHASE. The doctrine of the civil law with respect to the right of acquiring an interest in the use of water by prior appropriation and the application thereof to a beneficial use has never become a part of the laws of this state, and this without regard to whether the doctrine was ever in existence as a part of the laws in force in the territory acquired by the United States known as the Louisiana Purchase.

2. **Common Law:** RIGHTS OF RIPARIAN PROPRIETORS. The common-

Syllabus by court; catch-words by editor.

law rule with respect to the rights of private riparian proprietors has been a part of the laws of the state ever since the organization of a state government.

3. **Applicability of Common-Law Rule.** It can not be said that the common-law rule defining the rights of riparian proprietors is inapplicable to the conditions prevailing in the state because irrigation is found essential to successful agriculture in some portions thereof.

4. **Riparian's Right:** FLOW OF STREAM: PART AND PARCEL OF LAND: PROPERTY RIGHT: PROTECTION. A riparian's right to the use of the flow of the stream passing through or by his land, is a right inseparably annexed to the soil, not as an easement or appurtenance, but as a part and parcel of the land; such right being a property right, and entitled to protection as such, the same as private property rights generally.

5. **Rights of Riparian Owners:** VESTED RIGHTS: POWER OF LEGISLATURE TO ABOLISH: RIGHT OF EMINENT DOMAIN. The legislature has not abolished, nor does it possess the power to abolish, the rights of riparian proprietors which have become vested, except as such rights be taken or impaired for a public use in an exercise of the powers of eminent domain, for which compensation must be made for the injury sustained.

6. **Condemnation:** CONSTITUTION: STATUTE: NATURAL STREAM: RIPARIAN PROPRIETOR. The provisions of section 41, article 2, chapter 93a, Compiled Statutes, 1901 (section 6795, Annotated Statutes), and of section 21, article 1, of the constitution, authorize the condemnation of the right of a private riparian proprietor to the use and enjoyment of a natural stream flowing past his land, or its impairment by an appropriation of such water for irrigation purposes; and such riparian proprietor may recover damages in the same way and subject to the same rules as a person whose property is affected injuriously by the construction and operation of a railroad.

7. **Irrigation Act:** PUBLIC USE: RIPARIAN OWNER: INJURY: COMPENSATION: SUITABLE ACTION. The irrigation act of 1895 authorizes and regulates the appropriation of the waters of the state for irrigation and other purposes which are declared to be a public use; and in making appropriations of water as contemplated by the act, a riparian owner whose property rights are appropriated or impaired is entitled to compensation for the injuries actually sustained, to be recovered in a suitable action or proceeding instituted for that purpose.

8. **Interstate Rivers:** MEANDER LINES: NAVIGABLE RIVERS. As to those streams of water flowing through the state which may be classed as interstate rivers, and along the banks of which meander lines have been run by the government in its survey

Crawford Co. v. Hathaway.

of the public lands, the question is left open as to whether or not the waters of such streams may not be treated as waters of navigable rivers, to which riparian rights of an adjoining landowner would not attach as against the right of the public to use the waters thereof by its appropriation and application to beneficial purposes.

9. **Riparian Right:** NATURAL FLOW OF STREAM. While, as an abstract proposition of law, a riparian proprietor has the right to the ordinary natural flow of a stream, this rule would furnish no basis for compensation where water is appropriated for irrigation purposes; in order to entitle a riparian owner to compensation he must suffer an actual loss or injury to his riparian estate, which the law recognizes as belonging to him by reason of his right to the use and enjoyment of the water of which he is deprived.

10. **Riparian Proprietor:** USE OF WATER. Ordinarily, a riparian proprietor's right to the use of water of a stream is limited to its use for domestic purposes, and, if applied to the irrigation of riparian lands, a reasonable use for such purpose in view of an equal right to use belonging to all other riparian proprietors.

11. ———: IRRIGATION: RIPARIAN LAND. The right of a riparian proprietor as such to use water for irrigation purposes is limited to riparian lands.

12. **Contiguous Land.** The right can not be extended to lands contiguous to the riparian land, nor can water be diverted to non-riparian lands which might be used on riparian lands, but is not.

13. **Definition of Riparian Land.** Land, to be riparian, must have the stream flowing over it or along its borders.

14. **Extent of Riparian Land:** AREA OF A SINGLE ENTRY: QUÆRE. The extent of riparian land can not, in any event, exceed the area acquired by a single entry or purchase from the government; and whether, in view of the policy of the government in the disposition of its public lands, such riparian land may exceed the smallest legal subdivision of a section—that is, 40 acres—or in lieu thereof, if an irregular tract, a designated numbered lot, which is bordered by a natural stream, or over which it flows, *quære.*

15. **Two Doctrines of Water Rights.** The two doctrines of water rights, one the right of a riparian proprietor, and the other the right of appropriation and application to a beneficial use by a non-riparian owner, may exist in the state at the same time, and both do exist concurrently in this state.

16. **Riparian Rights:** COMMON-LAW RULE: PRECEDENCE. The common-law rule of riparian rights is underlying and fundamental

and takes precedence of appropriations of water if prior in time.

17. **Riparian Owner:** USUFRUCTUARY INTEREST: INCIDENT TO LAND. The riparian owner acquires title to his usufructuary interest in the water when he secures the land to which it is an incident, and the appropriator acquires title by appropriation and the application of the water to some beneficial use; the time when either right attaches determining the superiority of title as between conflicting claimants.

18. **Irrigation Acts:** ABROGATION OF PRIVATE RIPARIAN RIGHTS. The The irrigation acts of 1889 and 1895 abrogated the law of private riparian rights as theretofore existing, and substituted in its stead a law providing for the appropriation of the public waters of the state and their application to the beneficial uses therein contemplated.

19. **Effect of Legislation on Vested and Future Rights.** The legislative enactments referred to did not have the effect of abolishing vested rights of riparian proprietors, but affected only such rights as might have been acquired in the future under the law as theretofore existing.

20. **Judicial Notice:** IRRIGATION: VESTED RIGHTS: QUESTION OF FACT. The court will take judicial notice of the fact that since the early settlements of the western portions of the state, where irrigation has been found essential to successful agriculture, a custom or practice has existed of appropriating and diverting waters from the natural channels thereof into irrigation canals, and the application of such waters to the soil for agricultural purposes. Whether vested rights have been acquire thereby, must depend on the facts and circumstances as disclosed in any particular case.

21. **Use of Water:** PROPERTY RIGHT: SUPERIOR TITLE: SUBSEQUENT RIGHT. The right to the use of water, when acquired by appropriation, is in its nature a property right and becomes a superior and better title to the use and enjoyment of such water than that of a riparian proprietor whose right attaches subsequently.

22. **Act of Congress:** SCOPE. The act of congress of July 26, 1866, granted to those appropriating waters on the public domain for agricultural purposes a right in and to the use of such waters when made according to local customs, or when such right is recognized by the laws of the state or the decisions of the courts.

23. **Act of 1877:** SCOPE: ACTS OF 1889 AND 1895: EXPRESS RECOGNITION. The act of 1877 (Session Laws, 1877, p. 168) was an implied recognition of the right to appropriate the waters on the public domain according to the custom prevailing in the

Crawford Co. v. Hathaway.

arid states immediately west of us, and the irrigation acts
of 1889 and 1895 expressly recognized and preserved the rights
of those who had appropriated the public waters and applied
them to agricultural uses.

24. **State Board of Irrigation:** DUTIES: ADMINISTRATIVE, NOT JUDI-
CIAL: CONSTITUTIONALITY OF LAW. The duties of the state
board of irrigation as provided for in the irrigation act of
1895 (Session Laws, ch. 69), are administrative, and not judicial.
The sections of the statute creating such board are not un-
constitutional, as conferring judicial powers on executive offi-
cers.

25. **Riparian Rights:** LARGE NUMBER OF CLAIMANTS: APPROPRIATION:
PRESCRIPTION: INJUNCTION: MULTIPLICITY OF SUITS. Where a
large number of persons claim rights to use or divert the
waters of a stream by virtue of riparian rights, appropria-
tions, prescription or otherwise, a suit in equity to determine
such rights, and enjoin infringement, under color thereof, of
rights acquired under the irrigation act, may be maintained
to avoid multiplicity of suits.

26. ———: ———: OFFER TO DO EQUITY: COMPENSATION TO RIPARIAN
OWNER: DAMAGE PROPER SUBJECT OF INQUIRY. The plaintiff in
such a suit may offer to do equity by compensating riparian
owners whose rights are affected by the construction and
operation of a canal without leaving them to their actions at
law; and in that way the amounts due the several parties by
way of damages may become a proper subject of inquiry and
adjudication therein.

27. **"Domestic Purposes":** STATUTE: RIPARIAN PROPRIETOR: COMMON
LAW: LITTLE INTERFERENCE: DIVERSION: LARGE QUANTITIES:
CANALS: PIPE LINE. The term "domestic purposes", as used in
section 43, article 2, chapter 93a, Compiled Statutes, 1901 (sec.
6797, Annotated Statutes), has reference to the use of water
for domestic purposes permitted to the riparian proprietor
at common law, which ordinarily involves but little interfer-
ence with the water of a stream or its flow, and does not
contemplate diversion of large quantities of water in canals
or pipe lines.

28. **Common Law:** RIPARIAN OWNER: RIGHT DEFINED. The common
law does not give to a riparian owner an absolute and exclu-
sive right to the flow of all the water of the stream in its
natural state, but only a right to the benefit and advantage
of the water flowing past his land so far as consistent with
a like right in all other riparian owners.

29. **Superior Riparian Owner:** INJUNCTION: DIVERSION. A riparian
owner having a superior title to the use of the water of a
stream as against an appropriator is not entitled to maintain

an injunction to prevent the diversion of the storm or flood waters of the stream, and thereby prevent its application to a beneficial use, as contemplated by the statute.

30. **Inferior Riparian Owner: Receiving Water: Prescriptive Right.** There is no such thing as a prescriptive right of a lower riparian owner to receive water as against upper owners. Receiving the full flow of a stream for more than ten years does not give a prescriptive right that will prevent reasonable use of its waters by an upper owner.

REHEARING of the case reported in 60 Nebr., 754, and 61 Nebr., 317. Appeal from the district court for Dawes county. The appellant brought an action in the district court for Dawes county against Leroy Hall and others to adjudicate certain rights of the parties and to enjoin Hall, who was charged with making threats to tear down a dam erected by the appellant in White river, in Dawes county, by which nearly all the water in the river was diverted from the channel and caused to flow through plaintiff's ditch. Crawford is a village situated in Dawes county, in the arid district of Nebraska, on the banks of White river. The appellant was created for the purpose of constructing a canal which should furnish water to the village of Crawford. It was contended on the part of the appellant that the sewerage from Fort Robinson—situated above the village—ran into White river, destroying its purity and rendering it unfit for use. The appellee Leroy Hall owned a mill on White river below the village of Crawford; and as a riparian proprietor, claimed the right to the water by prescription. The appellant contended that no prescriptive right could arise from simply receiving water. Heard below before KINKAID, J. Judgment for defendants below. *Reversed.*

*Francis G. Hamer, Thomas F. Hamer, Allen G. Fisher* and *Justin E. Porter,* for appellant.

*Samuel Maxwell, Albert W. Crites* and *William H. Fanning,* contra.

*John S. Kirkpatrick* and *J. W. Deweese, amici curiæ.*

Holcomb, J.

An opinion prepared in this cause by the then chief justice, with one in its nature supplementary thereto, have heretofore been handed down by the court. *Crawford Co. v. Hathaway,* 60 Nebr., 754, and 61 Nebr., 317. The importance of the questions involved in a decision of the controversy, vitally affecting, as they do, the material interests of the state, and especially that portion of it where irrigation is necessary to successful agriculture, has induced us to grant a further hearing, and again to examine and consider the principal controverted points arising in the case. A full statement of the nature of the litigation is found in the opinion first filed, and we need not here restate it. Briefly, the appellant, who was plaintiff below, began an action, equitable in character, to have adjudicated the rights of different persons made parties to the action to the use of the water flowing in a stream called White river, and to enjoin the defendant Hall from a threatened interference with plaintiff's head-gate and works connected with an irrigating canal being constructed by it. The plaintiff claimed the right to divert the waters of the stream mentioned for irrigation purposes, and to supply the town of Crawford, situated near its proposed canal, with water for municipal purposes. Defendant Hall, owning and operating a mill adjacent to the stream, which had been utilized for power purposes, denies plaintiff's alleged right of appropriation and claims a right to the continued use of the water ordinarily flowing in the stream as a riparian proprietor. Numerous other persons, claiming some right to the use of the water as riparian owners or by appropriation, were also made defendants, with a view of having adjudicated the rights of all the parties to the litigation. The trial court refused to take jurisdiction and try the cause on its merits, for the reason that the water rights of the respective parties had not first been determined by the state board of irrigation, under the provisions of the irrigation act of 1895. On de-

fendant Hall's application on a cross-petition an injunction was granted against plaintiff restraining it from diverting the water of the stream into its irrigation canal, and the temporary injunction granted in its favor and against Hall was dissolved. From these several orders the plaintiff appeals.

The argument in this court has taken an exceedingly broad range. Narrowed to its simplest terms, the matters in dispute relate to conflicting rights and interests as between riparian owners, and those claiming as appropriators of the waters in the streams of the state for irrigation and other beneficial purposes. Incidental to the main question thus stated, there is involved the constitutionality of the irrigation act of 1895, creating and providing for a state board of irrigation, defining its duties, powers and authority, and especially the portion of the act which empowers such board to determine and adjust the amount and priority of right to the use of water by appropriation for irrigation purposes. There is also presented for consideration the correctness of the ruling of the trial court in dismissing the action begun by plaintiff without a hearing and judgment on its merits. Appreciating the fact that great interests are affected, and the far-reaching consequences of a decision regarding the matters in controversy when finally determined, more than the usual time has been taken in order that such full consideration might be given the case as the importance of the question presented seems to demand. In the former opinions we decided, in substance, that the plaintiff could not rely upon a statute for the purpose of enforcing its alleged right as appropriator and at the same time urge the invalidity of a material portion thereof on the ground of its alleged unconstitutionality, it being obvious that the invalid portion, if found invalid, formed an inducement to the passage of the entire act upon which its rights must rest if sustained; and that the act of the legislature of February 19, 1877, did not abrogate the common-law rights of riparian owners as they theretofore existed in this state.

It is also held that sections 47 and 48, article 2, chapter 93*a*, Compiled Statutes, 1897, constituted no acceptance of any supposed grant to the state by the federal government of the waters on the public domain. While some other questions of a minor character were determined, those just referred to are the only ones having a material bearing on the principal propositions we shall consider in the further examination of the case.

Much of the several briefs of counsel for plaintiff, whose rights are to be decided by the law relating to the right of appropriation of water for irrigation, is devoted to an argument in support of the contention that the doctrine of the rights of riparian owners as known and enforced at common law is inapplicable to, and has never legally become a part of, the laws of this state, and is not in force therein. It is insisted that the waters of the state, by virtue of the laws and ordinances in force when it was admitted to the Union, are *publici juris*, always have been, and may lawfully be diverted from any stream where naturally flowing, appropriated by non-riparian owners, and employed for any beneficial use; that the law of prior appropriation of water as defined by the civil law is in force in this state, and not the common-law rule of riparian proprietorship. The argument is constructed on the theory that the civil-law doctrine of appropriation of water in natural streams as belonging to the public became a part of the laws of the territory and state by reason of the Louisiana territory purchase from France, and that nothing since the acquisition of that territory has transpired which has had the effect of displacing the law as it then existed. It is said that while the enabling act for the admission of the state provided that the people inhabiting the territory forever disclaimed all right and title to the unappropriated public lands lying within the territory, and that the same should be and remain at the sole and entire disposition of the United States, yet the provision contained in the first state constitution declaring that the people of the state in their right of sovereignty are

Crawford Co. v. Hathaway.

to possess the ultimate property in and to all lands within the jurisdiction of the state, and all lands, the title to which shall fail from a defect of heirs shall revert or escheat to the people, preserved to them and to the state sovereignty and jurisdiction over the waters of the streams flowing therein, and left in force the doctrine of appropriation as theretofore existing. The scope and effect of the provisions referred to, as we view the subject, accorded to the government the primary right of disposal of the public lands, the state maintaining its sovereignty in the exercise of the powers of eminent domain and right to property resulting from escheats and forfeitures.

Without conceding or controverting the proposition of the civil law of appropriation ever being in force in the territory now comprising the state, we feel altogether clear that, in the organization of its government, the common-law rule of riparian proprietorship was established as a part of its laws. By the argument along the lines indicated, we are asked to overrule the many prior decisions of this court on the subject of water and water rights as they relate to riparian proprietors, and declare the law to be as it is applied in the arid states immediately west of us, where the waters of all the streams flowing in and through the states are held to belong to the state, in trust for the people, and subject to appropriation by any person or corporation for a beneficial purpose; the act of appropriating the water being the test of the right thereto and the use thereof, rather than the ownership of the banks between which the stream flows. The argument is not convincing, nor will it justify us in departing from sound and well-recognized principles of law in the decision of the cause. To adopt the doctrine contended for would be a most violent and radical departure from the trend of judicial decisions heretofore prevailing, and would overturn many well-settled and generally-accepted principles respecting property rights, and result in an invasion of vested private property interests which is

beyond the lawful power of the court or the legislature. To say there is no such thing as a property right of a riparian owner to the use of the stream flowing along or by his land, is to work a revolution in the jurisprudence of the state and violate fundamental principles which lie at the very foundation of the system.

In *Clark v. Cambridge & Arapahoe Irrigation & Improvement Co.*, 45 Nebr., 798, it is held that, except as abrogated or modified by statute, the common-law doctrine with respect to the rights of private riparian proprietors prevails in this country, and that such right is property, which, when vested, can be impaired or destroyed only in the interests of the general public, upon full compensation, and in accordance with established law. In speaking of the subject the court says (p. 806) : "Although the contrary has been asserted in some of the arid Pacific states (see *Reno Smelting, Milling & Reduction Works v. Stevenson*, 20 Nev., 269 [4 L. R. A., 60, 19 Am. St. Rep., 364] ; *Stowell v. Johnson*, 26 Pac. Rep. [Utah], 290), the common-law doctrine with respect to the rights of private riparian proprietors, except as modified by statute, prevails in this country. *Eidemiller Ice Co. v. Guthrie*, 42 Nebr., 238 [28 L. R. A. 581] ; Black's Pomeroy, Water [Rights], secs. 127, 130, and authorities cited. At common law every riparian proprietor, as an incident to his estate, is entitled to the natural flow of the water of running streams through his land, undiminished in quantity and unimpaired in quality, although all have the right to the reasonable use thereof for the ordinary purposes of life (3 Kent, Commentaries, 439; Angell, Watercourses, sec. 95; Gould, Waters, sec. 204; Black's Pomeroy, Water [Rights], sec. 8), and any unlawful diversion thereof is an actionable wrong." And further on: "The right of a riparian proprietor, as such, is property, and when vested can be destroyed or impaired only in the interest of the general public, upon full compensation and in accordance with established law. *Lux v. Haggin, supra* [69 Cal., 255, 265] ; *Yates v. City of Milwaukee*, 10 Wall. [U. S.],

497 [19 L. Ed., 984]; *Potomac Steamboat Co. v. Upper Potomac Steamboat Co.,* 109 U. S., 672 [4 Sup. Ct. Rep., 15, 27 L. Ed., 1070]; *Delaplaine v. Chicago & N. R. Co.,* 42 Wis., 214 [24 Am. Rep., 386]; *Bell v. Gough,* 23 N. J. Law, 624. That the state may, in the exercise of the right of eminent domain, appropriate the water of any stream to any purpose which will subserve the public interests, is not doubted, and that the reclamation of the inarable lands of the state is a work of public utility within the meaning of the constitution is a proposition not controverted in this proceeding. But even the state in its sovereign capacity is, as we have seen, within the restrictions of the constitution, and can take or damage private property only upon the conditions thereby imposed."

In *Plattsmouth Water Co. v. Smith,* 57 Nebr., 579, in a contest between riparian proprietors, where the water company was obtaining water from a watercourse flowing over its land to supply the city for domestic purposes, fire protection, etc., the doctrine is thus broadly stated: "Riparian owners upon streams of water are entitled, in the absence of grant, license or prescription, to the usual, natural flow of water in the streams, without material alteration."

In *Slattery v. Harley,* 58 Nebr., 575, it is again held: "The common law rules relative to the rights of private riparian proprietors are of force in this state, with the exceptions of statutory abrogations and changes."

With these explicit declarations respecting the rights of private riparian proprietors, made after mature deliberation, clear, indeed, should appear the soundness of a proposition which is advanced with a view of securing judicial sanction when the effect would be to overturn all the cases referred to, and many others we might cite. We do not feel justified in departing from a position so generally recognized and accepted as being correct, so well supported by reason and authority, and which it is believed is in soundness impregnable.

One branch of the argument pertaining to the subject

proceeds upon the theory that notwithstanding the different expressions of the court regarding riparian rights, only so much of the common law as is applicable, and not inconsistent with the constitution of the United States, with the organic law of this state, or with any law passed or to be passed by the legislature thereof, has been adopted and is in force in this state (sec. 1, ch. 15a, Compiled Statutes), and that the common-law rule with respect to the rights of riparian proprietors is inapplicable to the conditions prevailing here and for that reason riparian rights can not be said to have ever existed. To support this view of the law, it is said that because of the arid or semi-arid conditions prevailing in the western portions of the state, and the consequent necessity for the appropriation and application of water artificially to the soil in order that agriculture may be carried on successfully, the doctrine of the rights of riparian proprietors has no application, and should be so declared by the court. The law of necessity is appealed to, and it is urged the appropriation of water and its application to the soil for irrigation purposes is absolutely indispensable, in order that the wants of the people in the regions referred to may be supplied, agriculture carried on with success, and the country made productive, and capable of sustaining the inhabitants now residing there, and the thousands yet to come. The court is mindful of the great importance of the subject as affecting the most vital interests of the people of the localities where irrigation has by experience been found essential to successful agriculture, and its direct bearing on the material welfare of the state at large. Nor can it be doubted that it has been the policy of the legislature for many years past to encourage the development of the irrigation interests of the state by all legitimate methods which it found within its power to call into existence. In solving the problems arising in the development of this most important industry, and extending to it all legitimate encouragement and recognition which may properly come from the judiciary, we can not

lose sight of fundamental principles which should control our action, and govern in the disposition of all matters coming before the court for adjudication. Property rights, when vested, must be jealously guarded and upheld, or we do violence to the most rudimentary principles of justice. Admitting, for the sake of argument, that the law of public ownership of waters and the right of appropriation thereof for beneficial use by individual citizens and corporations is preferable to the private ownership of riparian proprietors in the western portion of the state, where irrigation is necessary, it is at once obvious that these conditions can be held to apply only to a portion of the state, and in fact to a lesser area than where irrigation is proved to be not essential to successful agriculture. As is pertinently said in the first opinion, 60 Nebr., 754, 762: "But can any one tell at what particular point in the state the common-law rule applicable to riparian owners would cease and the rule said to be better applicable to the less favored portions of the state would begin? Such a rule would merely tend to breed 'confusion worse confounded,' and would be an assumption of legislative powers by this court inhibited by the constitution." But it can not be said that the common-law rule of riparian ownership is inconsistent with the use of water for irrigation purposes, for, as we shall see later on, the right to the use of water for irrigation purposes is one of the elements of property belonging to the riparian owner along with that of its use for domestic and water-power purposes. If the common-law rule as to real property, when rights of riparian proprietors are involved, is to be abrogated, then why not say that the common-law doctrine as to other elements of real property or appurtenances belonging thereto, such as emblements, fixtures and easements, shall also be abrogated? The same reason for the rule exists in the one as well as the other, and can be denied in either only by the assumption of arbitrary power based on neither tenable grounds nor sound principles, and which should find no lodgment in the juridical branch of government.

On this same subject the supreme court of Washington—where climatic conditions are somewhat analogous to those prevailing here—in the case of *Benton v. Johncox*, 39 L. R. A., 107, 110, 61 Am. St. Rep., 912, 917, says: "But how it can be held that that which is an inseparable incident to the ownership of land in the Atlantic states and the Mississippi valley is not such an incident in this or any other of the Pacific states, we are unable clearly to comprehend. It certainly can not be true that a difference in climatic conditions or geographical position can operate to deprive one of a right of property vested in him by a well-settled rule of common law. The mere fact that the appellants will not be able to occupy or cultivate their lands as they heretofore have done unless they irrigate them with water taken from the Ahtanum river is no sufficient reason for depriving the respondents, who settled upon that stream in pursuance of the laws of the United States, of the natural rights incident to their more advantageous location. The necessities of one man, or of any number of men, can not justify the taking of another's property without his consent, and without compensation."

And says McKinstry, J., in *Lux v. Haggin*, 69 Cal., 255, 311: "Aridity of the soil and air being made the test, the greater the aridity the greater the injury done to the riparian proprietors below by the entire diversion of the stream, and the greater the need of the riparian proprietor the stronger the reason for depriving him of the water. It would hardly be a satisfactory reason for depriving riparian lands of all benefit from the flow, that they would thereby become utterly unfit for cultivation or pasturage, while much of the water diverted must necessarily be dissipated."

We can not, for the reasons given, lead ourselves to believe that there is any justifiable ground upon which we can deny the common-law rule of riparian proprietors to be in force in all portions of the state, except as it may be modified or supplemented by legislation of the state or of the congress of the United States, of which we will speak hereafter.

It is quite apparent to those who have investigated that the lawmaking branch of the government of the state, for the purpose of advancing the material interests and welfare of the people, has sought to provide for the building up of a great system of irrigation in those portions of the state where the rainfall is regarded as insufficient to successfully engage in agricultural pursuits, and has authorized, so far as it is empowered so to do, the appropriation of the waters of the state and their diversion from natural channels, to be used by applying them artificially to the soil for beneficial purposes. To uphold and assist in carrying forward this avowed legislative policy is our duty in so far as the same may be done by having due regard for the property rights and interests of all, which is to be determined by those well-settled and recognized rules of general appli... ... ... essential to the maintenance and protection ... ... rights and the adjustment of conflicting interests between all who are affected by the operation and enforcement of the law. The riparian proprietor, say all the books and the authorities, has a right to the flow of the water of the natural stream passing through or by his land; such right being inseparably annexed to the soil, and passing with it, not as an easement or appurtenance, but as a part and parcel of the land. This property right can be regarded only as a corporeal hereditament belonging to and incident to the soil, the same as though it were stones thereon, or grass or trees springing from the earth. Gould, Waters, section 204, and authorities there cited. The riparian right to the use of the water flowing in a natural watercourse is a property right, which should be regarded as such, and to protect which the owner may resort to any or all instrumentalities which may be employed for the protection of private property rights generally. *Gould v. Boston Duck Co.*, 13 Gray [Mass.], 442; *Ashley v. Pease*, 18 Pick. [Mass.], 268; *Blanchard v. Baker*, 8 Me., 253, 23 Am. Dec. 504; *Keeney & Wood Mfg. Co. v. Union Mfg. Co.*, 39 Conn., 576, 582; *Beissell v. Sholl*, 4 Dall. [U. S.],

211, 1 L. Ed., 804. The court could as properly say that in the prosecution of some important enterprise classed as works of internal improvement, such as the construction of irrigation canals, railroads, establishing public highways, or other similar undertakings, the property rights of the individual which are invaded or impaired must be ignored because of the necessity and advantage of the public enterprise as to say that the property right of a riparian proprietor may be sacrificed in order that the public welfare generally shall be advanced by promoting a system of irrigation where that method of moistening the soil is found necessary for successful agriculture. The question we are now dealing with has arisen in many of the states where resort to irrigation has been found beneficial and essential in some portions thereof to those engaging in agricultural pursuits, and in all such states, except those in the extreme arid portions of the country, it is held, as we have here held, that the common-law rule of the rights of riparian proprietors is not inapplicable because of the local conditions there prevailing, but is and has been in full force throughout all parts of such states. *Shamleffer v. Council Grove Peerless Mill Co.,* 18 Kan., 24; *Lone Tree Ditch Co. v. Cyclone Ditch Co.,* 91 N. W. Rep. [S. Dak.], 352; *Low v. Schaffer,* 24 Ore., 239; *Benton v. Johncox,* 39 L. R. A. [Wash.], 107; *Lux v. Haggin,* 69 Cal., 255. We can, therefore, for the reasons given, perceive of no tenable ground for adopting the view contended for, and hold the law of riparian rights, as determined by the principles of the common law, to be inapplicable to the conditions prevailing in the whole or in any part of this state.

It is also urged that by virtue of the legislation enacted the common-law rights belonging to riparian proprietors have been abolished. This position can not be, we think, successfully maintained. The legislature has not, as we construe the several acts of that body relating to the subject, attempted to abolish the common-law rule defining existing rights of riparian proprietors, or to deprive them

of such rights when once vested. On the contrary, such rights have been distinctly recognized. Nor is it believed that an attempt to abrogate such rights could be construed as other than an unconstitutional exercise of legislative power, and therefore invalid. In the irrigation act of 1889, the legislature sought to classify the streams in this state and restrict riparian rights to those owning lands bordering on streams not exceeding a certain width, but this attempted restriction proved abortive as an unwarranted act calculated to deprive riparian proprietors of vested property rights without due compensation, contrary to constitutional provisions in that regard. *Clark v. Cambridge & Arapahoe Irrigation & Improvement Co.*, 45 Nebr., 798. Otherwise, rights of riparian proprietors have in the different irrigation acts passed by the legislature been respected and recognized. What the legislature has done with a view of promoting irrigation, as we understand and construe the different laws enacted on the subject, is to provide for the appropriation of the unappropriated waters in the streams of the state and to authorize the condemnation of the property in and to the use of the waters belonging to riparian proprietors wherever required in order that the whole of the waters of a natural stream, when found necessary, may be used for irrigation purposes. The law when so construed violates no fundamental principle of property rights, nor interferes unlawfully with the property of another. Legislation of this character provides for the appropriation of the waters of the state by an orderly and legal method, and their diversion from the streams where flowing for the purpose of irrigation and for other purposes contemplated by law, and makes provisions for compensation to be made where private property rights are taken or damaged for a public use. This the legislature may lawfully do, and on account of which none may rightfully complain. That the common-law rule pertaining to the rights of riparian proprietors has been modified in many material respects under legislation by the United States congress and by

this state, will appear further on in this opinion. We are now speaking of the general rule pertaining to rights of riparian proprietors, and not of its exceptions and modifications, which we shall hereafter speak of. We conclude, therefore, that in this state, under any view we may take of the subject, the right of riparian proprietors to the use of the waters flowing in the streams to which their lands are adjacent, when once attached, is in its nature a vested right of property, a corporeal hereditament, being a part and parcel of the riparian land which is annexed to the soil, and the use of it is an incident thereto, of which the owners can not rightfully be deprived or divested except by grant, prescription or condemnation, with compensation by some of the means and methods recognized by law for the taking or damaging of private property for public use.

The development of a system of irrigation and the appropriation and application of the waters of the streams of the state for that purpose is obviously a work of internal improvement. It is so regarded and has been expressly declared by the legislature since its first enactment on the subject, and has been affirmed by this court in more than one of its decisions. By the act of the legislature approved February 19, 1877, the organization of corporations for the purpose of constructing and operating canals for irrigation was authorized, and such corporations were given power to acquire right of way, and to condemn property necessary to the construction of such canals, in the same manner as railroad corporations might acquire property and right of way for railroad purposes, and the law applicable to an exercise of the right of eminent domain by railroad companies was made to apply to such irrigation companies. It was also expressly declared that canals constructed for irrigation purposes were works of internal improvement, and all laws applicable to such enterprises should apply to such irrigating canals. Session Laws, 1877, p. 168. The irrigating act of 1877, with powers more amplified, was merged

in and became a part of the irrigation law passed by the legislature of 1889. Session Laws, 1889, ch. 68, p. 503. The law of 1889 was superseded by the more comprehensive act of 1895; the substance of the provisions of the two sections of the act of 1877 being embraced in sections 39 to 48, as found in article 2, chapter 93a, Compiled Statutes, 1901 (secs. 6793-6802, Annotated Statutes). Indeed, section 2 of the act of 1877 has been re-enacted in each succeeding law on the subject almost verbatim, while the substance of the other section of that act has been incorporated in several different sections of the act of 1895. It is manifest by a casual inspection of the different laws passed by the legislature that since the passage of the original act of 1877, above referred to, the construction of irrigation canals has been recognized and treated by the legislature as a work of internal improvement, to construct and operate these the right to take private property for a public use has been found necessary, and provisions, although at first somewhat obscure in their application, have been made by the legislature to accomplish that end. While sections 39 and 41 of the act of 1895 (art. 2, ch. 93a, Compiled Statutes, 1901 [secs. 6793 and 6795, Annotated Statutes]) are framed chiefly with a view to authorize the condemnation of rights of way for such enterprises, there appears to exist no substantial reason why they should not be construed as embracing within their scope and effect the same powers and privileges that are given to corporations organized under the district irrigation law which are expressly authorized to condemn the riparian proprietors' right to the use of the water, and divert it for irrigation purposes. Sec. 10, art. 3, ch. 93a, Compiled Statutes, 1901 (sec. 6831, Annotated Statutes). We are of the opinion the broad provisions of section 41 of article 2, when fairly construed, suffice for the purpose of authorizing condemnation for irrigation purposes, as contemplated by article 2, to the same extent as is authorized by section 10 when the irrigation business is conducted under the provisions of article 3. The con-

cluding words of section 41, article 2, which is a substantial reenactment of the provisions contained in the latter part of the first section of the act of 1877, are as follows: "Upon the filing of said petition [for condemnation] the same proceedings for condemnation of such right of way shall be had as is provided by law for the condemnation of rights of way for railroad corporations, and the same provisions of law providing for the condemnation of rights of way for railroad corporations, the payment of damages and the rights of appeal shall be applicable to irrigating ditches, canals, and to other works provided for in this act." If the construction and operation of a ditch or irrigating canal results in injury to the rights of riparian proprietors, or takes from them private property for a public use, the provisions of the law with respect to the recovery of damages where property is taken or injured by railroad companies in the exercise of the right of eminent domain become applicable, and may be resorted to by the riparian owners for the recovery of the compensation secured to them by the constitution. If the authority of section 41 seems insufficient, further authority is found in section 48 of the same chapter, wherein it is provided that canals and other works constructed for irrigation or water-power purposes are works of internal improvement, and all laws applicable to works of internal improvement are applicable to such canals and irrigation works. Under these comprehensive provisions the legislature could have intended nothing less than that in the construction and operation of irrigation enterprises private property reasonably necessary for the conduct of the business could be taken and appropriated on due compensation by the exercise of the power and right of eminent domain. Water for the irrigation canals contemplated by the act is absolutely indispensable for the successful prosecution of the enterprise. In fact, water to flow in the ditches to be constructed for the purpose of irrigating the soil for the production of crops was the overshadowing and all-controlling factor, without which the

law, so far as promoting the public welfare, would be but a hollow mockery, suggestive of a highly absurd situation—an anomalous condition of affairs. Water, and the necessity of diverting it from its natural channels and appropriating it for irrigation purposes as a public use, being of the very essence of the act authorizing the construction and operation of irrigation enterprises, can there exist any rational doubt that, under the provisions we have referred to, the right and authority to condemn property belonging to a riparian proprietor was given to those constructing such works of internal improvement for the purpose of putting the water to the public and beneficial uses contemplated and intended by the passage of the act? By section 81 of chapter 16, Compiled Statutes (sec. 9967, Annotated Statutes), entitled "Railroads," these corporations are authorized to take, hold and appropriate so much real property as may be necessary for the construction and convenient use of their roads. The power of eminent domain which may be exercised under the provisions of this section of the statute has by the legislature been referred to and become a part of the irrigation statute, as much so as though actually incorporated therein. There are other sections of the law with reference to internal improvements of other kinds than that of railroads which might also be resorted to, and which are fairly susceptible of a like construction, when considered in connection with the irrigation acts, which in terms refer to such laws as giving to irrigation canal .companies power to condemn property necessary and essential to their use in the conduct of the business engaged in as contemplated by statute. The property in water belonging to a riparian proprietor and his right to the reasonable use thereof, as we have seen, is a part and parcel of the land, inseparably annexed to the soil, and is property within the meaning of that word, of which the owner can not be divested save and except by some lawful method, which would apply alike to all species

of real property and appurtenances belonging thereto.* This property right, like any other part of his realty, is subject to condemnation and appropriation for public uses in the manner provided by law. It may also be lost by grant or prescription.

In *McGee Irrigating Ditch Co. v. Hudson*, 22 S. W. Rep. [Tex.], 967, it is held that while in that state the irrigation act provides for the condemnation of a right of way only for an irrigation canal, still, under the Revised Statutes, article 628, section 6, authorizing canal companies to condemn any land necessary for their use, an irrigation company formed under the act of 1889 of the laws of Texas may divert water which a riparian proprietor had the right to have flow in a certain channel, and to the use thereof as such owner, since such diversion is, in effect, taking land, which may be done under the right to take private property for public uses. Says the court in the opinion by Stayton, C. J.: "The general law providing for the incorporation of canal companies contains the following, among the powers conferred on such corporations: 'To enter upon, and condemn and appropriate, any land of any person or corporation that may be necessary for the uses and purposes of said company; the damages for any property thus appropriated to be assessed and paid for in the same manner as provided by law in the case of railroads.' Revised Statutes, art. 628, sec. 6. The law first quoted evidently only provides for condemnation of ground over which an irrigation ditch might run, and, in the absence of a law providing for the condemnation of every property necessarily taken in such an enterprise, no right to condemn would exist. The act of March 19, 1889, in so far as it provides for condemnation, however, is not in conflict with article 628,

---

* It is to be hoped that this isolated sentence will never be quoted as a holding that there can be property in water. The doctrine that there can be no property in the corpus of water, but that the right to it is usufructuary—that is, the right to the use without impairing the substance—is horn-book law. See authorities quoted later in this opinion.—W. F. B.

Revised Statutes. The provisions of the latter are broader than the former, and under the power therein given to enter upon, condemn and appropriate lands, we are of opinion that any property belonging to plaintiffs, and necessary for the uses and purposes of defendant, in the business for which it was created, may be condemned, if it will pass, or may be included, under the term 'lands.' The word 'land' includes, not only the soil, but everything attached to it, whether attached by the course of nature, as trees, herbage, and water, or by the hand of man, as buildings and fences."

In this state the court has repeatedly held that section 21, article 1, of the state constitution, is of itself a sufficient basis to justify an action for the recovery of all damages arising from an exercise of the right of eminent domain which causes a diminution in the value of the private property of another. *Chicago, K. & N. R. Co. v. Hazels,* 26 Nebr., 364; *Burlington & M. R. R. Co. v. Reinhackle,* 15 Nebr., 279, 48 Am. Rep., 342. In the cases cited the question of damages arose, not for the taking of property, but for damage to abutting property by railroad companies, resulting from obstruction of streets and highways and other incidents of their construction and operation of railways, causing a depreciation in the value of abutting property. The right of the property owner to the benefit and advantage of a street and highway adjacent to his land and the right of the riparian owner to the reasonable use and enjoyment of the water in a stream flowing over or adjoining his land, are not without features rendering them in a measure analogous. Speaking of the right to the use and enjoyment of the privilege and advantage attaching to abutting property on the public streets, it is said by the Michigan supreme court that such owner has "a peculiar interest in the adjacent street which neither the local nor the general public can pretend to claim; a private right in the nature of an incorporeal hereditament legally attached to his contiguous ground; an incidental title to certain facilities and fran-

chises, which is in the nature of property, and which can no more be appropriated against his will than any tangible property of which he may be owner." *Grand Rapids & I. R. Co. v. Heisel,* 38 Mich., 62, 71, 31 Am. Rep., 306. It is thus apparent that as to the property right of a riparian proprietor to the reasonable use of the water naturally flowing in the stream, provisions effective in character by virtue of the constitution and the statutes exist for the appropriation of such property and the diversion and use of the water for irrigation purposes, and that upon payment of adequate compensation for the property taken or damaged no substantial reason can be urged why the same may not be done without violating any principle governing property rights known to our system of jurisprudence. The right of a riparian proprietor to the reasonable use of water flowing in a natural channel is property, which is protected by the ægis of the constitution, and of which he can not be deprived against his will, except for public use, and upon due compensation for the injury sustained. If the legislature had undertaken to sweep away and abolish this right, we would not be warranted in giving the act judicial sanction. Where by any possible construction of a reasonable nature legislation can be upheld, it is our duty to give it such a construction as will uphold, rather than destroy it. The irrigation act of 1895 is valid when construed as not interfering with vested property rights which have been acquired by riparian proprietors. Such a construction, we are satisfied, is justified by a fair interpretation of the act in its entirety, considering its tenor, purport, and the object intended to be accomplished by its enactment.

The statute authorizes and regulates the appropriation of the waters of the state for irrigation and other purposes, and, in making such appropriations as contemplated by act, the riparian owner whose property rights are appropriated or impaired, is entitled to compensation for the injuries actually sustained, to be recovered in a suitable action or proceeding instituted for that purpose. The

construction given renders the act effective as providing a method for the development of the semiarid portions of the state by means of a system of irrigation, including the appropriation and application of the waters flowing in the streams, to the more useful and beneficial purposes of fructifying the soil for the comfort and blessing of mankind.

Our discussion on the rights of riparian owners has extended only to those streams of water where the bed over which a stream flows is included within the survey of the public lands as made by the United States government, from whom the riparian owners obtain title. Such is the character of the stream the water of which is the subject of the present controversy. In the case at bar, the stream is a narrow one, ordinarily flowing but a small volume of water, the bed thereof belonging to the contiguous landowner. Whether the common-law rule fixing the rights of riparian proprietors applies to the larger streams of the state, such as may be classed as interstate rivers, and along the banks of which meander lines have been run by the government in its survey of the public lands, presents an entirely different question, and it would seem that riparian rights would not attach to the waters of such rivers. A final determination of the question, however, is not here made, as this should be left to be decided in a proper case, where the subject is fairly presented and considered after opportunity for thorough investigation, aided by the researches and arguments of counsel. As to those streams whose banks form the boundary lines of the estates adjoining, there are forcible reasons, well grounded on authority, for holding to the view that the rules of the common law applicable to navigable streams, as therein designated and classified, should be held applicable to all such rivers, even though in fact non-navigable. *Wood v. Fowler*, 26 Kan., 682, 40 Am. Rep., 330; *Lux v. Haggin*, 69 Cal., 255; *St. Louis, I. M. & S. R. Co. v. Ramsey*, 13 S. W. Rep. [Ark.], 931, 8 L. R. A., 559, 22 Am. St. Rep., 195; Gould, Waters, sec. 78. While this

subject received slight attention in the case of *Clark v. Cambridge & Arapahoe Irrigation & Improvement Co.*, 45 Nebr., 798, it was not determined, as a decision of the case turned on another point. As to navigable streams, the doctrine seems to be that the water and the soil thereunder belong to the state, and are under its sovereignty and domain, in trust for the people, and can not, therefore, be the subject of a claim of property therein, or the right to the use thereof by an adjoining landowner. When the government, in its survey, runs meander lines along the banks of a stream and parts with its title to the adjoining land, the boundary of which would be highwater mark, then it would seem permissible to classify the stream as navigable, in which case the waters thereof and the bed thereunder would belong to the state, and be held by it in trust for the people. The waters in such streams would be held to be *publici juris*, and not subject to riparian claims by the adjoining landowner, *Shirely v. Bowlby*, 152 U. S., 1, 14 Sup. Ct. Rep., 548, 38 L. Ed., 331; *Illinois C. R. Co. v. State*, 146 U. S., 387, 13 Sup. Ct. Rep., 110, 36 L. Ed., 1018; *Packer v. Bird*, 137 U. S. 661, 11 Sup. Ct. Rep., 210, 34 L. Ed. 819; *Martin v. Waddell*, 16 Pet. [U. S.], 367, 10 L. Ed., 997; *Pollard v. Hagan*, 3 How. [U. S.], 212, 11 L. Ed., 565; *Richardson v. United States*, 100 Fed. Rep. [C. C.], 714.

The extent of the riparian proprietor's rights in and to the use of the waters of a natural channel is material to a satisfactory disposition of the subject we now have in hand. This right, stated in its broadest terms, is that "every proprietor of lands on the banks of a river, has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (*currere solebat*), without diminution or alteration. No proprietor has the right to use the water, to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. *Aqua currit*

*et debet currere,* is the language of the law. Though he may use water while it runs through his land, he can not unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate." 3 Kent, Commentaries, 439; *Smith v. City of Rochester,* 92 N. Y., 463, 473, 44 Am. Rep., 393. While, as an abstract rule of law, a riparian proprietor is entitled to the full flow of the stream as it is wont to flow by nature, yet the rule has so many exceptions and has been so modified as the law has progressed, that the nature and extent of a riparian proprietor's pecuniary interests or property in a stream can not be measured by such a rule, nor can the rule now be said to be a full and accurate statement of the law. The law does not recognize a riparian property right in the corpus of the water. *Vernon Irrigation Co. v. City of Los Angeles,* 39 Pac. Rep. [Cal.], 752. The riparian proprietor does not own the water. He has the right only to enjoy the advantage of a reasonable use of the stream as it flows by his land, subject to a like right belonging to all other riparian proprietors. Kinney, Irrigation, sec. 59; Gould, Waters, sec. 204; *Embrey v. Owen,* 6 Exch. [Eng.], 353. The property interest in the water is usufructuary and his right thereto is subject to many limitations and restrictions, and always depends upon its reasonableness when considered in connection with a like right as belonging to all other riparian proprietors. His use must be reasonable, whatever may be its purpose; and he may not, under any circumstances, by his use materially damage other proprietors, either above or below him. *Union Mill & Mining Co. v. Dangberg,* 81 Fed. Rep. 73; *Williamson v. Lock's Creek Canal Co.,* 78 N. Car., 156 The mere fact that the riparian proprietor is deprived of the full flow of the stream adjacent to his land would furnish no basis for compensatory damages; merely diminishing the volume of water in the stream would not deprive the owner of property for which he could lay claim to a pecuniary compensation. At most, the naked

right to the full flow of the stream, and its loss by diminishing the volume of water when appropriated for irrigation purposes, could result only in *damnum absque injuria*. In order to entitle the riparian owner to compensation, he must suffer an actual loss or injury to the use of the water which the law recognizes as belonging to him, and to deprive him of which is to take from him a substantial property right. It is for an interference with or injury to his usufructuary estate in the water for which compensation may rightfully be claimed where the water of the stream is diverted and appropriated for the use of irrigation; it is such a taking of or damage to property as materially and substantially depreciates the value of the real estate of which it forms a part. Ordinarily the riparian property right would be limited to the use of the water of the stream for domestic purposes, and, if applied to the irrigation of riparian lands, a reasonable use for such purposes in view of an equal right of use belonging to all other riparian proprietors, which would fix the basis for compensation where there has been a deprivation of such right by the appropriation of the water for a public use. *Low v. Schaffer*, 24 Ore., 239.

A riparian proprietor's right to the use of water for irrigation purposes must be understood as applying to riparian lands only. He would have no rights as a riparian owner which could extend to non-riparian lands. This raises the question as to the extent or area of lands bordering on a stream, or over which it flows, which may properly be classed as riparian lands. A riparian owner's right to the reasonable use of water exists solely by virtue of his ownership of the lands over or by which the stream flows. It is obvious that this right can not be enlarged or extended by acquisition of title to lands contiguous to the riparian land; nor can a riparian owner, as such, rightfully divert to non-riparian lands water which he has a right to use on riparian land, but which he does not so use. *Chauvet v. Hill*, 28 Pac. Rep. [Cal.], 1066; *Gould v. Eaton*, 49 Pac. Rep. [Cal.], 577, 38 L.

R. A., 181; *Bathgate v. Irvine*, 58 Pac. Rep. [Cal.], 442, 77 Am. St. Rep., 158. Land, to be riparian, must have the stream flowing over it or along its borders, and the vital question is how far away from the stream it may be considered to extend.

The subject is considered in the case of *Lux v. Haggin*, 69 Cal., 424, 425. It is there held that a riparian tract of land (in that case the title to which had been obtained from the state) would include all the sections or fractional sections mentioned in any one certificate of purchase bordering on a natural water channel, or through which it had its course; but says the court: "If, however, lands have been granted by patent, and the patent was issued on the cancelation of more than one certificate, the patent can operate, by relation (for the purpose of this suit), to the date of those certificates only, the lands described in which border on the stream."

In *Boehmer v. Big Rock Creek Irrigation District*, 48 Pac. Rep. [Cal.], 908, it is held that where quarter sections of land are granted by separate patents based on separate entries, and therefore constituting distinct tracts of land, mere contiguity can not extend a riparian right incident to only one quarter section, although both are owned by the same person.

The rule in California seems to be that where riparian lands are acquired by an entryman or purchaser by any one entry or purchase, the boundary of the riparian land would be restricted to the land the title of which was acquired by the one transaction; that each tract thus acquired would be treated as an independent tract, beyond which riparian rights could not extend. It is the policy of the government in the disposition of the public lands in this state, as it has been the policy of the state regarding her school lands, to have the land surveyed into townships, sections and subdivisions of sections, in order that it may be disposed of in limited quantities in legal subdivisions not less than one-sixteenth of a section, comprising a forty-acre tract, and usually not ex-

ceeding a quarter section of 160 acres. The forty-acre tract, or one-fourth of a quarter section,—or, if an irregular tract, it is designated as a certain numbered lot,—may be, and usually is, taken as the unit of measurement in the acquisition of title to the public lands within the state. As an illustration, the government authorizes the disposition of the public lands under the preemption, homestead or timber culture laws in tracts of not less than forty acres nor more than 160 acres. Where more than forty acres are taken it is not required that it be in any particular form or located within one particular section or quarter section, but if the forty-acre tracts adjoin each other and do not exceed the maximum acreage allowed in one entry, a party may thus acquire a good title to the land. Within the limits of railroad grants homestead entries were limited to tracts not exceeding eighty acres, while the railroad grants of land by the government are usually by sections of 640 acres each. Where a homestead of eighty acres has a watercourse through it, which also runs through a section of railroad land adjoining, there appears no sound reason for saying that the riparian land in one instance would include but eighty acres and in the other 640. If the riparian proprietor's right is incident to the soil, is a part and parcel of the real estate, like the trees and the grass, then it would seem that in this state, at least, in view of the policy of the government in the disposition of its public lands, riparian rights would attach only to those legal subdivisions of a section ordinarily described as forty-acre tracts, or, in lieu thereof, where the tracts are irregular, to a certain designated lot, which borders on a stream or through which it flows. There is neither reason nor logic for saying that when one acquires a forty-acre tract with the riparian rights belonging thereto, such is the limit of the riparian lands in that case, but where, on the same stream, an entire section is acquired by grant from the government, that the whole of the 640 acres, for that reason, becomes riparian land. It being

the policy of the government to dispose of its public domain in tracts of not less than forty acres each, why, then, may it not be said that riparian rights are limited to such tracts, even though several of them may be joined together in one certificate of purchase or instrument of conveyance? It is not decided that such should be the rule in this state, as it is deemed preferable to leave the question open for maturer investigation and consideration.

From what has been said, it must not be inferred that the rights of an appropriator for beneficial purposes contemplated by statute are not as sacred and as much entitled to the equal protection of the law as is the property right of riparian proprietors. Indeed, the property right of an appropriator in water diverted from natural channels and applied to irrigation uses is distinctly recognized in the case of *Clark v. Cambridge & Arapahoe Irrigation & Improvement Co.*, 45 Nebr., 798, where the doctrine of estoppel was applied to the acts of the riparian owner, and it was held that, because of his laches, he could not maintain an injunction suit to restrain the diversion of the water by an appropriator and its application to the soil by means of irrigation, and that he would be left to his ordinary remedy at law for compensation for the injury sustained. The two doctrines of water rights—one the rule of priority of appropriation and the other the common-law doctrine of riparian ownership, whose basis is equality between all those who own lands upon the stream —may, in our judgment, both exist at the same time, as both have existed in this state, as we shall endeavor hereafter to demonstrate. We have spoken of the common-law rule, made so by the legislative adoption of the principles of the common law when applicable and not inconsistent with the laws of the state. Valid vested rights have also been acquired by reason of the prior appropriation of the public waters of the state which have received sanction and recognition by the legislature and by the congress of the United States, which place the

title of the appropriator on an equality with riparian owners. The fundamental hypothesis of prior appropriation of water for the development of the arid or semiarid portions of the country, is the recognition of the right of the people or those desiring, to appropriate, and apply to beneficial uses any unemployed water of the natural streams, and that such rights, when so acquired, are to be determined according to the date of appropriation; priority of acquisition giving the better right. The two doctrines are not necessarily so in conflict with each other as that one must give way when the other comes into existence. The common-law rule of riparian rights is underlying and fundamental and takes precedence of appropriations of water if prior in time. The two doctrines stand side by side. They do not necessarily overthrow each other, but one supplements the other. The riparian owner acquires title to his usufructuary interest in the water when he appropriates the land to which it is an incident, and when the right is once vested it can not be divested except by some established rule of law. The appropriator acquires title by appropriation and application to some beneficial use, of which he can not be deprived except in some of the modes prescribed by law. The time when either right accrues must determine the superiority of title as between conflicting claimants.

The irrigation act of 1889 abrogated in this state the common-law rule of riparian ownership in water, and substituted in lieu thereof the doctrine of prior appropriation. This legislation could not and did not have the effect of abolishing riparian rights which had already accrued, but only of preventing the acquisition of such rights in the future. The law of 1895 but continued in force the act of 1889 in so far as that act abrogated the common-law rule as to the rights of riparian proprietors, and since the taking effect of the act of 1889 those acquired rights to the waters flowing in the natural channels of the state are to be tested and determined by the doctrine of prior appropriation. That it was competent

for the legislature to abrogate the rule of the common law as to riparian ownership in waters as to all rights which might be acquired in the future, and substitute a system of laws providing for the appropriation and application of all the unappropriated waters of the state to the beneficial uses as therein contemplated, there exists, it would seem, no reasonable doubt. In *United States v. Rio Grande Dam & Irrigation Co.*, 174 U. S., 690, 19 Sup. Ct. Rep. 770, 43 L. Ed., 1136, it is held that it is within the power of a state legislature to change the common-law rule of riparian proprietors and authorize the appropriation of the flowing waters within its dominion for such purposes as it deems wise and proper. The substitution of the law of prior appropriation, instead of the common-law rule of riparian ownership, is applicable only to those waters in the state which are unappropriated, or, in other words, which have not become the property of riparian proprietors. In our view of the subject, the right of the appropriators of water who have applied the same to the soil for agricultural purposes by means of irrigating canals antedates the passage of either of the irrigation acts of the legislature of which we have just made mention. This right has grown out of the necessities of the case, and has been sanctioned by the acts of congress and recognized by the laws of the state. It is a matter of common knowledge, historical in character, that in the development of the state in the higher altitudes in the western portions, because of the arid or semiarid climatic conditions which prevail, it has been found impossible to successfully engage in agricultural pursuits save by applying to the soil, by the process known as irrigation, waters diverted and drawn from natural streams, thereby rendering highly productive a land otherwise valuable only for grazing. It is a fact so common and notorious that we may properly take judicial notice of it that since the early settlement of the western portions of the state it has been the custom of the settlers to appropriate the waters of the

streams flowing therein by means of irrigating canals and apply them to the soil in prosecuting the business of agriculture in all its varied branches. We do not mean to say that there has grown up in the section of the state referred to a custom adopted by the people which has been perfected into a system or code of laws respecting the appropriation of water for agricultural purposes, nor do we find this necessary in the present case. What is said is that from the earliest settlement of the semiarid portions of the state, and before the enactment of any irrigation statute providing for the appropriation of water, there has existed a practice or usage of diverting water from the natural channels of the streams into irrigation canals constructed for that purpose, and the appropriation and application of such water for agricultural purposes. Whether or not under this practice or custom appropriators have acquired rights which are in their nature property, and which when once acquired become a superior title, and give the better right to the use of such water than that of a riparian owner whose title is acquired subsequently, must depend on facts and circumstances as disclosed in any particular case. When such a custom has been so generally recognized as to have the force of law, it can only be regarded as a substantial adoption of the doctrine of prior appropriation of water which obtains in the arid states immediately west of us.

Says Mr. Justice Miller, in speaking of the United States statute recognizing the right of those who have appropriated water for agricultural purposes: "The section* of the act which we have quoted was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one." *Broder v. Natoma Water & Mining Co.,* 101 U. S., 274, 276, 25 L. Ed., 790. The section just referred to is contained in an act of congress of July 26, 1866, and provides "that whenever, by priority of possession, rights to the use of water for mining, agri-

* 14 U. S. Statutes at Large, p. 253, sec. 9.

cultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed: *Provided, however,* That whenever, after the passage of this act, any person or persons shall, in the construction of any ditch or canal, injure or damage the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage." 14 U. S. Statutes at Large, p. 253, sec. 9.

In a decision by the United States supreme court (*Basey v. Gallagher,* 87 U. S., 670, 22 L. Ed., 452), in which the opinion was prepared by Mr. Justice Field, the section we have just quoted was under consideration. It is there said by the author, after speaking of another case decided prior thereto (*Atchison v. Peterson,* 87 U. S., 507, 22 L. Ed., 414): "Ever since that decision it has been held generally throughout the Pacific states and territories that the right to water by prior appropriation for any beneficial purpose is entitled to protection. Water is diverted to propel machinery in flour-mills and sawmills, and to irrigate land for cultivation, as well as to enable miners to work their mining claims; and in all such cases the right of the first appropriator, exercised within reasonable limits, is respected and enforced. We say within reasonable limits, for this right to water, like the right by prior occupancy to mining ground or agricultural land, is not unrestricted. It must be exercised with reference to the general condition of the country and the necessities of the people, and not so as to deprive a whole neighborhood or community of its use and vest an absolute monopoly in a single individual. The act of congress of 1866 recognizes the right to water by prior appropriation for agricultural and manufacturing pur-

poses, as well as for mining. * * * It is very evident that congress intended, although the language used is not happy, to recognize as valid the customary law with respect to the use of water which had grown up among the occupants of the public land under the peculiar necessities of their condition; and that law may be shown by evidence of the local customs, or by the legislation of the state or territory, or the decisions of the courts. The union of the three conditions in any particular case, is not essential to the perfection of the right by priority; and in case of a conflict between a local custom and a statutory regulation the latter, as of superior authority, must necessarily control."

In *Lux v. Haggin*, 69 Cal., 255, 446, it is observed by the California supreme court: "From the foundation of the state, waters pertaining to the public lands of both the federal and state governments have been appropriated and used for mining, agriculture, and other useful purposes. Such appropriation and use was first sanctioned by custom, next by the decisions of the courts, and finally by legislative action on the part of the United States as well as the state. It thus became a part of the law of the land, of which every citizen was entitled to avail himself, and of which every purchaser from the United States, as well as the state, was bound to take notice. In protecting, therefore, the rights of the appropriators of water upon the public lands of the state and of the United States, no wrong is done to the purchasers from either government. That from the very beginning it has been the custom of the people of the state to divert from their natural channels the waters of the streams upon the public lands, and appropriate the same to the purposes of mining, agriculture, and other useful and beneficial uses, is a part of the history of the state."

See, also, *Isaacs v. Barber*, 30 L. R. A. [Wash.], 665, 45 Am. St. Rep., 772, where it is held that judicial notice will be taken of the fact that at least that portion of the state east of the Cascade Mountains was included within

the territory where the customary law of miners was in force and the right of appropriating water for agricultural and manufacturing purposes existed, although the common-law rule of riparian ownership was a part of the law of the state.

Recognizing the necessity for the appropriation of water and its application to the soil for agricultural purposes, the legislature of this state, in 1877, passed an act having for its object the formation of corporations for the construction and operation of canals for irrigation, and for that purpose gave them the right to acquire right of way for such canals, and declared the canals to be works of internal improvement.  Session Laws, 1877, p. 168.  It is manifest from a reading of the act, brief though it is, that the legislature, recognizing the conditions existing in the semiarid portions of the state where the tide of emigration was then beginning to flow, and the necessity of appropriating the public waters for agricultural purposes by means of irrigating canals, passed the act with the view of providing effective means for the appropriation of such waters and their application to the soil in order that agriculture might be successfully engaged in, and the resources of the state developed.  Without irrigation the country was principally of use for grazing; with it, and a soil for fertility unsurpassed which it possessed, and a favorable climate, the country could be made to blossom as the rose, and to sustain a population of thousands, where but hundreds had previously found a means of livelihood.  Who can doubt that by the passage of this act the legislature, composed as it was of intelligent men, intended to and did recognize the right of the inhabitants of the public domain—those settling there for the purpose of building permanent homes—to construct irrigation canals and appropriate the waters of the natural streams for the purpose of promoting agriculture and developing the country?  It would be the height of absurdity to say that the construction of irrigation canals was authorized for any other purpose or with any other view

than the appropriation of the public waters flowing in the streams.    Congress had authorized and sanctioned the appropriation of water for the purposes contemplated by the legislative act.    It had declared by the act of 1866 that in the disposition of the public domain riparian proprietors took title to their lands subject to the rights of appropriators who had acquired title to the use of water by appropriation for agricultural purposes, where such rights were recognized by local customs, by the legislature or by the courts.    Practically all the lands in the semiarid portions of the state at the time belonged to the government.    It was the riparian proprietor, and it authorized the appropriation and diversion of the water for agriculture, mining and manufacturing purposes.    The state recognized and encouraged the appropriation of water for agricultural purposes by the passage of the act of 1877.    There were no riparian proprietors except the general government, or at most but a few, who were or could be affected by the act. ' It contemplated the appropriation of the waters of the streams and their use for irrigation to meet the necessities of the case in conformity with the customs and usages prevailing in arid portions of the western country, where irrigation was essential to agriculture.    The congressional act of 1866 authorized this to be done, and land thereafter disposed of by the United States was subject to prior rights acquired by appropriation.    The act of 1889 (Session Laws, 1889, ch. 68, p. 503), in which was merged the act of 1877, especially recognized the rights acquired by prior appropriators and treated them as it would any other vested property rights.    Section 13, article 1 thereof, declares: "All ditches, canals and other works heretofore made, constructed or provided by means of which the waters of any stream have been diverted and applied to any beneficial use must be taken to have secured the right to the waters claimed to the extent of the quantity which said works are capable of conducting and not exceeding the quantity claimed without regard to, or compliance with, the re-

quirements of this chapter." And the act of 1895 preserved all rights acquired by appropriation prior to its passage. Session Laws, 1895, ch. 69, p. 244. By section 49 it is provided: "Nothing in this act contained shall be so construed as to interfere with or impair the rights to water appropriated and acquired prior to the passage of this act."

In the light of the provisions of the act of congress as construed by the supreme court of the United States, the different acts of the legislature of this state relating to the appropriation of the waters flowing in the streams thereof, and taking notice of those historical facts connected with the development of which we have made mention, the conclusion appears to us irresistible that every appropriator of water who has applied it to the beneficial uses contemplated by these several acts has acquired a vested interest therein, which gives him a superior title to the use of the water over the riparian proprietor whose right has been acquired subsequent thereto, or who has lost his right, once acquired by either grant or prescription. Assuming, then, as we think should be done, that the right of acquiring an interest in the use of water by appropriation when applied to the beneficial purposes of agriculture has existed in this state since its early settlement in those portions where irrigation is found to be necessary, the decisive question in all cases as between riparian proprietors and those claiming as appropriators is who first secured the right to the use of the water in controversy. Has the riparian proprietor, who appropriates his riparian water right as an incident to and a part of the land obtained from the government, and whose right then attaches, a superior claim, or has the appropriator a better right because prior in time? The answer in each case must depend upon the facts and circumstances as developed therein. As to the law applicable to controversies between those claiming as riparian proprietors and those claiming by right of prior appropriation, see *Low v. Schaffer*, 24 Ore., 239; *Speake v. Hamilton*, 21 Ore.,

3; *Kaler v. Campbell*, 13 Ore., 596; *Ramelli v. Irish*, 96 Cal., 214; *Judkins v. Elliott*, 12 Pac. Rep. [Cal.], 116.

In support of its right to maintain an action of the character of the one at bar, it is argued by the plaintiff that those sections of the irrigation statute constituting the state board of irrigation with authority to ascertain and determine the priority and amount of past appropriations and allow further appropriations when it is determined there is unappropriated water in any natural stream from which it is sought to divert it, and with other powers as therein defined, are unconstitutional, because conferring judicial powers upon a tribunal not authorized by the constitution, and in contravention of its provisions. As we have heretofore made mention, the lower court in the trial of the case refused to entertain jurisdiction and try the merits of the controversy, holding that the state board of irrigation had exclusive original jurisdiction of the matters set out in the petition, and that as to all issues raised by the pleadings, save those pertaining to an injunction to hold matters *in statu quo* pending a determination of such rights, the respective parties should be remanded to the board for such remedies as they might be found entitled to. It is no doubt true, as pointed out by counsel, that the sections in question are borrowed from the statutes of Wyoming, in which state constitutional provisions authorize the creation of such a board, while our constitution is silent on the subject. But it is to be noted that the Wyoming constitution has not provided for a board of irrigation with judicial functions in the sense that it is a judicial tribunal. The duties of the board there, as here, are supervisory and administrative in character, and not judicial. While it may be true that they are given powers of a *quasi*-judicial character, this of itself does not constitute them a judicial body, nor does it have the effect of conferring upon administrative bodies the exercise of judicial functions in contravention of constitutional provisions. The Wyoming statute, from which ours is borrowed, has been subjected

to judicial construction, and is upheld by the supreme court of that state on the express ground that the powers authorized therein are not judicial, but administrative. *Farm Investment Co. v. Carpenter,* 50 L. R. A. [Wyo.], 747, 87 Am. St. Rep., 918. With this authoritative construction of the statute, and a decision of the very question raised in the case at bar upon reasoning quite convincing and satisfactory, it would seem that the question should be regarded as at rest. The primary object of the board is for the purpose of supervising the appropriation, distribution and diversion of water. This is obviously an administrative rather than a judicial function.

Says the Wyoming supreme court, in the case just cited (p. 757) : "It is a matter of public concern that the various diversions shall occur with as little friction as possible, and that there shall be such a reasonable and just use and conservation of the waters as shall redound more greatly to the general welfare and advance material wealth and prosperity"; and, quoting from *White v. Farmers' Highline Canal & Reservoir Co.,* 43 Pac. Rep. [Colo.], 1028, 31 L. R. A., 828: "From the very nature of the business, controversies with reference to the use of water, naturally led to unseemly breaches of the peace; and, to avoid these, it was found expedient and necessary to provide complete rules of procedure governing the taking of water from the public streams of the state, and regulating its distribution to those entitled thereto"—as it were, a sort of policing of the waters capable of use for irrigation, as necessary and required, as well to preserve and procure proper use of the water as to prevent breaches of the peace. In order to accomplish this object it is necessary and expedient to provide for certain preliminary investigations. Again, quoting from *Farm Investment Co. v. Carpenter, supra* (p. 758) : "Any effort to supervise and control the waters of the state, their appropriation and distribution, in the absence of an effective ascertainment of the several priorities of rights, must result in practical failure in times when official intervention is

most required.   *   *   *   In the development of the irrigation problem under the rule of prior appropriation, perplexing questions are continually arising, of a technical and practical character.   *   *   *   The board is not required to await the occurrence of controversies, but is to proceed, on its own motion, to ascertain the various rights, conflicting or not, and thereupon see that the water is properly divided."

Such functions, it would seem, are clearly administrative in character, and not judicial.   It is a judicial function to administer justice between litigants in cases where disputes arise and to settle these disputes according to law as administered in courts of justice.   The board of irrigation, however, in many cases acts in advance of any dispute, and whether there is or will be a controversy in no way affects its powers.   The courts can act only as controversies arise between litigants, and then only by determining the questions presented by the litigation. While there are some questions affecting property rights which grow out of the administration of the law by the state board of irrigation, and in which are involved matters in dispute calling for action of a *quasi*-judicial character, yet as to all these ample provisions are made for recourse to the courts.   Powers of the same general nature and character are conferred upon almost every administrative body known to the statute, and regarding which it has frequently been decided are of a *quasi*-judicial nature, and yet such bodies are invariably held to be administrative, and to in no way conflict with the constitutional provisions regarding officers and bodies upon whom judicial power may be conferred.   The state board of transportation, as heretofore organized in this state, the constitutionality of which has been invariably upheld when attacked, in all respects, save as to the manner of passing the law providing for its creation, is a fair illustration of the validity of legislation of this character.   Numerous other boards and offices created by statutes, of an administrative character, and yet possessing powers of a *quasi-*

judicial nature, might also be referred to if thought to serve any useful purpose. For the reasons given, we are of the opinion that the sections of the act in question are not obnoxious to the constitution on the objections raised by counsel, and that the authority of the board of irrigation to make the determinations contemplated by the act, and the requirement of its approval as a condition to the right of appropriation under the provisions of the act, is a valid exercise of legislative power.

It does not, however, necessarily follow from the conclusion just reached as to the powers and duties of the board that the courts are in any way ousted of their jurisdiction over actual controversies. The board is possessed of powers of an administrative character. The courts have judicial powers, and while the board may make all needful preliminary determinations to enable it to regulate the distribution of water, and may determine whether or not proposed appropriations shall be allowed, and in what order, in pursuance of the provision of the statute, subject to the right of appeal, whenever a controversy arises over the substance of the rights of various parties making use of a stream, such controversies are proper for the courts to take judicial cognizance of. The courts can not administer the statute nor regulate the use of the streams, but they can and should adjudicate disputes based on the rights of parties acquired under the statute. The statute does not create a mere license to the use of water appropriated; it creates a right in and to the use of the water, and expressly provides for its sale and disposal in the same manner as real property. Section 63, art. 2, ch. 93a Compiled Statutes (section 6817, Annotated Statutes). See, also, *Strickler v. City of Colorado Springs,* 26 Pac. Rep. [Colo.], 313, 25 Am. St. Rep., 245; *Frank v. Hicks,* 35 Pac. Rep. [Wyo.], 475. Whenever it becomes necessary to vindicate or support such a right by judicial proceedings, the courts should be open and available therefor as in the case of a controversy regarding any other property right; hence it is that all controversies over water rights

arising under the statute are not necessarily for the board of irrigation alone. If a controversy has been submitted to that board and by it adjudicated, and no appeal taken, an entirely different question is presented. But where the board has made no determination and a large number of persons are claiming the right to divert and use the water of a stream, some by appropriation under the statute, some under prior acts, some by prescription, and others as riparian owners whose rights have accrued prior to the statute and have not been divested, we know of no sound reason why a suit in equity to determine and adjust such rights and enjoin interference with those rights by others under a claim of right may not be maintained. Such suits are permitted everywhere where the system of appropriation adopted by our statute obtains. In some states they have been provided for by statute, but in the absence of statutes, they have been upheld under general principles of equity jurisdiction. *Frey v. Lowdon,* 70 Cal., 550. In our opinion, it is altogether proper to permit such suits in this state where riparian rights exist and have long existed, but are subject to be divested or impaired by appropriations of water under the statute upon due compensation therefor. The litigation involved in the appropriation of water from a stream, the banks of which are thickly settled, would be endless if the jurisdiction of a court of equity to prevent multiplicity of suits could not be invoked. This principle has been appealed to frequently over litigation of water rights, and has been held to permit of a single suit by a plaintiff against all of a large number of persons having or claiming rights in the water of the stream which infringed on the rights of such plaintiff. Gould, Waters, sec. 564. The chief difficulty in such cases arises from the fact that the several defendants have several rights and interests, and are not so connected in interest that a determination as to one would include them all. There is to be found in the reported cases and in the text-books authority for a limitation of the jurisdiction to prevent a multiplicity of suits

Crawford Co. v. Hathaway.

in such cases, but the weight of authority, following the leading case of *Mayor v. Pilkington*, 1 Atk. [Eng.], 282, holds to a contrary doctrine. *Miller v. Highland Ditch Co.*, 87 Cal., 430, 22 Am. St. Rep., 254; *Hillman v. Newington*, 57 Cal., 56; *Woodruff v. North Bloomfield Gravel Mining Co.*, 8 Sawy. [U. S. C. C.], 628; *Meyer v. Phillips*, 97 N. Y., 485, 49 Am. Rep. 538. See, also, *New York & N. H. R. Co. v. Schuyler*, 17 N. Y., 592; *Thorpe v. Brumfitt*, 8 Ch. App. Cas., L. Rep. [Eng.], 650, 656; *Western Land & Emigration Co. v. Guinault*, 87 Fed. Rep., 523; *United States v. Flournoy Live-Stock & Real-Estate Co.*, 69 Fed. Rep., 886; *Hammontree v. Lott*, 40 Mich., 190; 1 Pomeroy, Equity Jurisprudence, secs. 252-260. For such reasons we are of the opinion the plaintiff might properly bring such an action as the one before us, so far as it comes within the scope of a bill of peace, to avoid a multiplicity of actions.

There is much in the petition to indicate that the action was intended as a general condemnation proceeding as well, and that some sort of administrative proceeding in parceling out and distributing the waters of the stream in controversy was contemplated, as well as the determination of the rights of the several parties. All this administrative work is for the board of irrigation, and, so far as relief of that nature is sought, the lower court acted correctly in remanding the parties to their remedies by a proper application to the board. It is also true that proceedings for condemnation in furtherance of an irrigation project can not be joined with a suit in equity of the kind just considered. A petition, however, must be judged and the nature and character of the action thereby begun determined, chiefly by the facts alleged and the legal results thereof, and remedies appropriate thereto. *Alter v. Bank of Stockham*, 53 Nebr., 223, 230. Disregarding much surplusage and irrelevance, the prayer for an injunction against the several defendants, and the allegations upon which it is based, are sufficient to bring the petition within the jurisdiction of a court of equity. Nor do we

see any reason for not holding that the plaintiff in a suit in equity in the nature of a bill of peace to protect his water right and determine and define conflicting rights to or claims upon the waters of the same stream may offer to do equity by compensating riparian owners whose rights are affected by the construction and operation of a canal under his appropriation, and that in this way the amounts due the several parties claiming rights by way of damages may become a proper subject of inquiry and adjudication therein. .

One other feature of the plaintiff's case, it seems proper to here give consideration. The plaintiff, it appears, was under contract to furnish water to the village of Crawford for general municipal purposes, including water for sprinkling streets and for power for a lighting plant, and was also under some obligation to the general government to furnish water for flushing the sewers at Fort Robinson, an occupied military post located near the village of Crawford. Furnishing water for the uses referred to it is claimed is a domestic use of the water, within the purview of section 43, article 2, chapter 93a, Compiled Statutes (section 6797, Annotated Statutes), and because thereof the plaintiff claims priority over several defendants as an appropriator of water for domestic and agricultural purposes under the statute. As far as the canal is intended for irrigation, the appropriation of water to flow therein is obviously an appropriation for an agricultural purpose. We do not, however, agree with counsel that the other purposes named are domestic, within the meaning of the statute. In our opinion, the term "domestic purposes," as used in the statute, has reference to the use of water for domestic purposes as known and recognized at common law by riparian proprietors. Gould, Water Rights, sec. 205. The common law distinguishes between those modes of use which ordinarily involve a taking of small quantities of water, and but little interference with the stream, and those which necessarily involve a taking or diversion of large quantities, and

a considerable interference with its ordinary flow. The use of a stream in the ordinary way by a riparian owner for drinking and cooking purposes and for watering his stock, is a domestic use. It involves no considerable diversion of water and no appreciable interference with the stream. This right of the riparian owner the statute intended to preserve to him, and to protect against appropriations of water for other uses by canals, ditches and pipe-lines, whereby large quantities would be abstracted. This is the only construction which will give any force to the statute. If all of the water of a stream may be diverted by a canal for so-called domestic purposes involving incidental use for power, the priority given agricultural uses is rendered nugatory. This is the construction given similar provisions elsewhere. *Montrose Canal Co. v. Loutsenhizer Ditch Co.*, 48 Pac. Rep. [Colo.], 532; *Broadmoor Dairy & Live-Stock Co. v. Brookside Water & Improvement Co.*, 52 Pac. Rep. [Colo.], 792.

In the first case cited the court says (p. 534) : "While it is true that section 6 of article 16 of the constitution recognizes a preference in those using water for domestic purposes over those using it for any other purpose, it is not intended thereby to authorize a diversion of water for domestic use from the public streams of the state by means of large canals. * * * The use protected by the constitution is such as the riparian owner has at common law to take water for himself, his family, or his stock, and the like."

The principle upon which the decree on the cross-petition of the defendant Hall proceeds is in the main correct. Having been brought into court by the plaintiff, he sets up his previously-acquired riparian rights, the infringement thereof by plaintiff, and consequent damage, and prays an injunction. It is probably true he would not necessarily have been entitled to an injunction in an independent suit brought by him for that purpose, since there would be no question of repeated trespasses in case plaintiff had acquired a superior right by appropriation for irri-

gation purposes, and an action at law for damages would be an adequate remedy.  But when the plaintiff sued him and prayed for an injunction against him, he could demand that plaintiff do equity and pay his damages before any relief be awarded.  The court, we think, was justified in enjoining any interference with the riparian rights of the defendant Hall until this was done.  It also appears that as to those uses to which the plaintiff was putting or seeking to put the water sought to be appropriated by it, not agricultural, defendant had a right to insist that he had priority by reason of his long-continued use for power and manufacturing purposes, and an injunction against any diversion beyond what was used by plaintiff for irrigation, so far as such diversion injured defendant Hall, was proper, in so far at least as he was able to make a beneficial use of the water for power purposes for which it was used.  Section 20, art. 2, ch. 93a, Compiled Statutes (section 6774, Annotated Statutes).  But the injunction granted goes much beyond either of these grounds.  As has been seen, the common law does not give to a riparian owner an absolute and exclusive right to all the flow of the water from a stream in its natural state, but only the right to the benefit, advantage and use of the water flowing past his land in so far as it is consistent with a like right in all other riparian owners.  Hall was entitled to an injunction restraining any unreasonable diversion of the water which produced a substantial injury to him.  But he could not insist that the slightest sensible diminution in the volume of the water be stopped merely as such.  He was entitled only to protection to the right which he had acquired as a riparian owner against any unlawful invasion thereof.

Connected with this same question is involved the right of the plaintiff, even as against a riparian owner, to divert the storm or flood waters passing down the stream in times of freshets.  Hall at most, as a riparian owner, was entitled to only the ordinary and natural flow of the stream, or so much as was found necessary to propel his

mill machinery, and could not lawfully claim as against an appropriator, the flow of the flood waters of the stream.

In *Modoc Land & Live-Stock Co. v. Booth*, 102 Cal., 151, 156, it is said on this subject: "It seems clear, however, that in no case should a riparian owner be permitted to demand, as of right, the intervention of a court of equity to restrain all persons who are not riparian owners from diverting any water from the stream at points above him, simply because he wishes to see the stream flow by or through his land undiminished and unobstructed. In other words, a riparian owner ought not to be permitted to invoke the power of a court of equity to restrain the diversion of water above him by a non-riparian owner, when the amount diverted would not be used by him, and would cause no loss or injury to him or his land, present or prospective, but would greatly benefit the party diverting it."

And in *Fifield v. Spring Valley Water-Works*, 130 Cal., 552, it is held that a riparian proprietor is not entitled to an injunction to restrain a water company engaged in supplying water for public use from diverting the storm or flood waters of a creek which will not prevent the flowing over his land of the ordinary waters of the stream, nor in any way damage his land or interfere with the rights appurtenant thereto. See, also, *Edgar v. Stevenson*, 70 Cal., 286; *Heilbron v. '76 Land & Water Co.*, 80 Cal., 189; Black's Pomeroy, Water Rights, sec. 75.

On the arguments of the case at bar, it was suggested that defendant Hall had acquired a prescriptive right to the full flow of the stream by ten years' user. There can not be, in the very nature of things, any such thing as a prescriptive right of a lower riparian owner to receive water of a stream as against upper owners. The riparian owner is entitled to the reasonable use and enjoyment of the water of the stream and to insist that the water come to his land to be so used and enjoyed. He may, by prescription, acquire a right to use and divert the water beyond that which the common law would give him, but he gets

this right only by adverse user. If he diverts water which otherwise would flow down to a lower owner, that use is adverse. On the other hand, the water which comes to him would come in any case, and there is nothing adverse to any one, in merely receiving it, that could be said to give a prescriptive right enabling him to prevent reasonable use of it by the upper owner. *Hargrave v. Cook*, 41 Pac. Rep. [Cal.], 18, 30 L. R. A., 390; *Bathgate v. Irvine*, 58 Pac. Rep. [Cal.], 442, 77 Am. St. Rep., 158; *Mud Creek Irrigation, Agricultural & Mfg. Co. v. Vivian*, 11 S. W. Rep. [Tex.], 1078.

We have herein discussed some matters having an indirect bearing on the main issues involved in the case. The court, however, must not be understood as being committed to any proposition not expressly decided.

It follows from what has been said that the order of the trial court dismissing the plaintiff's action must be reversed, and the cause remanded, with directions to proceed in the further trial of the cause in accordance with the views herein expressed.

REVERSED AND REMANDED.

SEDGWICK, J.

I concur in the conclusions reached upon the following questions, which are necessarily involved in the determination of this case.

1. The common-law doctrine of riparian rights is the basis of our law upon that subject, and governs, so far as applicable to our conditions, matters not regulated by our irrigation statutes.

2. Those parts of the irrigation act of 1895 which provide for a board of irrigation, and the adoption of the rule of ownership of water by appropriation, are constitutional.

3. A suit in equity may be maintained against persons claiming rights to use or divert water of a stream to prevent infringement, under the color of such right, of the rights of plaintiff acquired under our irrigation act.

4. Damages accruing to such parties by reason of appropriations under the irrigation act become a subject of inquiry and adjudication in such an equity suit.

5. Lower riparian owners do not acquire a prescriptive right to receive water as against upper owners.

6. I think the scope and character of the riparian rights of the defendant Hall, under the facts disclosed in the cross-petition, are rightly determined.

I express no opinion on the discussion of the doctrine of appropriation as existing independently of and prior to our statutes. If irrigation enterprises are to be met with demands for damages claimed to accrue from interfering with the ownership of the body of the water in our streams, which ownership, it is claimed, is derived from some other source than the irrigation statutes, it seems to me that it will be a serious obstacle in the way of the growth and development of such enterprises, and such rules ought not to be announced until the occasion has arisen in actual litigation, and after full discussion. The doctrine of the private ownership of the body of the water of running streams is not to be found in the common law, nor in the civil law, but was originated in our mining states, and developed there under the influence of the necessities of our miners, and later of farmers in the arid and semi-arid districts. It is in the light of these facts that we must determine how far the common law has been modified by our constitution, and the legislation thereunder, and how far it is applicable to existing conditions. The question whether the law of riparian ownership applies to "the larger streams of the state" appears to depend upon whether the owner of the land is held to own to the thread of the stream or only to the banks, and the former was determined to be the law of this state in *McBride v. Whitaker*, 65 Nebr., 137. I am not satisfied with the discussion of the extent of lands that may be called riparian, and do not see how it is involved in this case.